WILLIAM SAFFOLD ET AL. *v.* JOHN W. HORNE ET AL.

1. HUSBAND AND WIFE. *Witnesses.    Estate of decedent.    Code* 1892, §§ 1739, 1740.

    Under § 1739, code 1892, husband and wife are competent witnesses for each other in all cases.    The fact that one, being interested, is, under § 1740, incompetent to testify against the estate of a decedent, does not affect the competency of the other.    *Ellis* v. *Alford*, 64 Miss., 8.

2. AGREEMENT OF COUNSEL.    *Grammatical construction.    Intent.*

    Grammatical construction will not be allowed to override the manifest intent of an instrument.    An agreement of counsel that "any and all testimony taken in another case may be used in this" is properly held to embrace a deposition taken in such other case, after the date of the agreement, it appearing that this was the construction acted on by the counsel then engaged in the cause.

3. DEED.    *Evidence showing delivery.    Case.*

    When one conveys to two persons, living at the time with him, a two-thirds interest in his lands, in consideration of services rendered and to be rendered, and the deed, which with the acknowledgment is in his own handwriting and signed by him, and also by the grantees, was recorded, and the grantor in conversation with others recognized their interest, the presumption as to delivery is not overthrown by the fact that the instrument appointed the grantees executors of the grantor, thus raising a suspicion that he thought it a will, and by the fact that it was not acknowledged and recorded until seven years after being signed, and that the grantor continued in sole possession, paying taxes, and sold off parts of the land, and that the deed was found among his private papers after his death.    *Neblett* v. *Neblett*, 70 Miss., 572, cited.

4. SAME. *Validity of acknowledgment. When immaterial. Actual delivery.*
   Where the question at issue is as to the actual delivery of a deed,
   and no rights of third persons growing out of the registry laws are
   involved, the validity or invalidity of the acknowledgment is im-
   material.

FROM the chancery court of Harrison county.

HON. W. T. HOUSTON, Chancellor.

The opinion states the facts.

*Nugent & Mc Willie,* for appellants,

Filed a brief, reviewing the course of legislation and the de-
cisions in this state touching the competency of husband and
wife as witnesses for or against each other, citing and discuss-
ing the following cases: *Lockhart* v. *Luker,* 36 Miss., 68;
*Dunlap* v. *Hearn,* 37 *Ib.,* 471; *Stuhlmuller* v. *Ewing,* 39 *Ib.,*
447; *Hedges* v. *Aydelott,* 46 *Ib.,* 99; *Reinhardt* v. *Evans,* 48
*Ib.,* 230; *Rushing* v. *Rushing,* 52 *Ib.,* 329; *Barry* v. *Sturdi-
vant,* 53 *Ib.,* 490; *Rothschild* v. *Hatch,* 54 *Ib.,* 554; *Byrd* v.
*State,* 57 *Ib.,* 243. It is true that § 1739, code 1892, pro-
vides that husband and wife may be introduced by each other
as witnesses in all cases, civil or criminal, and shall be compe-
tent witnesses in their own behalf as against each other in all
controversies between them, but the next section is a qualify-
ing proviso to § 1739, and also to § 1738, which removes all
common law disability growing out of interest. Under these
sections it is clear that Horne is incompetent, and it seems clear
that the common law rule is restored in cases where husband or
wife are offered as witnesses to establish a claim for the other
against the estate of a decedent. This conclusion is the logical
result of the language used in *Byrd* v. *State, supra.* The
common law excluded husband and wife as witnesses both for
and against each other in all cases. If the wife, in cases against
deceased persons, can be allowed to testify in support of her
husband's claim, the force of the statute will fail in the very
purpose contemplated. The rule of the common law, or reason

of the rule, is that there is an identity of interest, so if the husband cannot testify the wife cannot. This rule is wholly unaffected by our statute. Another reason for her exclusion—namely, public policy—applies with equal force. We find several cases illustrating the views we contend for. See 44 Ala., 227; 46 *Ib.*, 580; 47 *Ib.*, 636; 60 *Ib.*, 522; 71 *Ib.*, 210—all cases arising under a statute similar to ours. See, also, 64 Penn., 77; *Ib.*, 20. If we are correct in our position that § 1740, code 1892, so far modifies the preceding sections as to restore the common law rule when the estates of decedents are involved, it necessarily follows that Mrs. Horne was not competent to establish her husband's claim against the estate of Saffold. See 26 Am. R., 331.

2. The deposition of Crawfoot should have been excluded. The agreement of counsel covered testimony then taken. This is manifest from the use of the past participle " taken."

3. It was error to overrule exceptions to interrogatories eight and seventeen, and the answers thereto of Mrs. Horne. The first question assumes that there were some reasons given by Saffold why Horne should live with him, and therefore suggests an answer. The answer to interrogatory seventeen shows that she did not recollect whether Saffold said that two-thirds of his property belonged or would belong to Horne and Humphries.

4. The bill should have been dismissed. The fundamental issue relates to the delivery of the deed. It always remained in the possession of the grantor, and was never, so far as proof goes, in the possession of the grantees. There was no constructive delivery with intent to pass title. The difference in the case of *Neblett* v. *Neblett*, 70 Miss., 572, and this is apparent. The law on this subject is clearly stated in 5 Am. & Eng. Enc. L., 445, note 3. See, also, 11 Am. R., 547; 16 *Ib.*, 35; *Ib.*, 592; 17 S. E. Rep., 213; 34 N. H., 460; 55 N. W. Rep., 326; 22 S W. Rep., 560; 17 *Ib.*, 321; 8 *Ib.*, 161; 37 Miss., 501; 11 Ill., 563; 63 Mich., 111. Leaving a deed for record

can only be constructive delivery, if done with the knowledge of the grantee, and with the evident or expressed intention that the title is to pass.    5 Wall., 86; 105 Mass., 560; 39 Vt., 538; 15 Mich., 101.    The intention to have the registration must be proved.    10 Mass., 456; 10 Johns., 418; 1 Denio, 326; 2 Harr., 501; 4 *Ib.*, 1.

The instrument under which appellees claim is a very strange document.    It was not acknowledged until seven years after execution, and it never left the grantor's possession.    Appellees never, during the life of Saffold, asserted title or paid taxes, but Saffold, until the date of his death, had full control and possession of the property.    Any presumption, therefore, growing out of the acknowledgement and registration of the deed is met and overthrown.    *Harkreader* v. *Clayton*, 56 Miss., 383; *Davis* v. *Williams*, 57 *Ib.*, 843; *Metcalfe* v. *Brandon*, 58 *Ib.*, 841; *Bullett* v. *Taylor*, 34 *Ib.*, 708.    It is evident that Saffold thought the instrument was a will, and it is evident that he did not intend it to take effect until he died. See 67 Maine, 559; 118 Mass., 154.

*E. J. Bowers, J. M. Shelton* and *George S. Dodds,* for appellees.

1. The question of the competency of the testimony of Mrs. Horne in support of her husband's claim is set at rest by § 1739, code 1892, and by *Rushing* v. *Rushing*, 52 Miss., 329; *Barry* v. *Sturdivant*, 53 *Ib.*, 490, and *Ellis* v. *Alford*, 64 *Ib.*, 8.

2. The agreement as to the admission of the deposition was obviously made to save costs, and clearly contemplated the use of all testimony then on file or thereafter to be taken in the other case.

3. It abundantly appears from the record that the deed was delivered.    The presumption of the delivery arising from the record of the deed has not been overthrown.    The validity or invalidity of the acknowledgment can throw no light on the question of actual delivery.    It is not true that the presump-

tion of delivery arises only from acknowledgment; it follows from the act of the grantor making, or attempting to make, a public record of the muniment of title. The presumption of delivery is strengthened by the fact that Saffold himself wrote and signed the acknowledgment; by the fact that it was then placed upon record; moreover, the grantees signed the deed, indicating its delivery to them, and their acceptance of it.

In *Neblett* v. *Neblett*, 70 Miss., 572, the evidence against delivery was far stronger than in this case. Saffold is shown to have been a man of superior intelligence. He knew the necessity of putting a deed on record, and its effect. After it was recorded, he declared to others that he had deeded appellees an interest in his lands in payment for their services. The fact that the deed was found among Saffold's papers after his death, cannot overturn the proof of delivery. Humphries and Saffold for years lived in the same house. They were on terms of the utmost intimacy and friendship. The deed was for the benefit of the grantees, and their acceptance would have been presumed. *Wall* v. *Wall*, 30 Miss., 91.

Argued orally by *W. L. Nugent*, for appellants, and *J. M. Shelton* and *E. J. Bowers*, for appellees.

S. S. CALHOON, Special J., delivered the opinion.

On June 29, 1892, Horne and Humphries filed their bill against the heirs of R. C. Saffold, who died on January 30, 1891, intestate, charging that, on April 1, 1867, he conveyed to each of them a one-third interest in the lands in controversy, by deed signed by him and by them also, and that he, on October 18, 1874, more than seven years after its execution, acknowledged it, and that it was filed for record October 21, 1874, three days after its acknowledgment, and that it was duly recorded the next day; and they pray partition of the land.

Whether or not this deed was delivered is the main feature

of the case.   Saffold's heirs filed an answer and cross bill, in
which they denied the delivery of the deed by him, and say it
remained in his possession up to the date of his death, and
that its acknowledgment and filing for record occurred by in-
advertence or mistake, or were obtained by the fraudulent pro-
curement of Horne, who had put it among Saffold's papers,
and he had acknowledged it inadvertently with other deeds on
the same day, filed for record at the same time.   They say
that Horne and Humphries never set up any claim until after
Saffold's death; that Saffold remained in possession of all the
lands as his own, cutting timber, receiving rents and selling
some parcels of them, and all of them continued to be assessed
to him, and he paid all the taxes, all of which was within the
knowledge of Horne and Humphries, who made no protest,
and who set up no claim.   They say the deed was without
consideration, and that no services were ever rendered by
Horne and Humphries to Saffold, as recited in the deed; that
the deed was never intended to pass title, but was upon some
trust known only to the parties to it, and that Horne and Hum-
phries must show what the trust was, and must show its per-
formance.   They pray cancellation of the deed as a cloud on
their title.

Horne and Humphries answered the cross bill, under oath,
and it is only necessary to say now that their answers over-
throw the cross bill if the case stood upon the cross bill and
answers.   Testimony was taken· up to April 12, 1893, on
which day the then counsel for the parties agreed as follows:
" That any and all testimony taken in the case of *J. W. Horne
et al.* v. *W. L. Nugent et al.* may be used in this cause," sub-
ject to objections as to relevancy and competency.

A deposition of Hubbard Crawfoot, taken after this agree-
ment of counsel dated April 12, 1893, was read in evidence
over the objection of defendants on the ground that the agree-
ment referred only to the testimony then already taken.   This
is a question for consideration by this court.

Defendants withdrew their cross bill, but the court, *a quo*, permitted the answers of Horne and Humphries to the cross bill to be read in evidence. On appeal, this court reversed this action, and held that the answers fell with the cross bill. It was agreed as fact that R. C. Saffold wrote the deed and signed it and wrote the acknowledgment all with his own hand, and that the signatures of Horne and Humphries were genuine. The certificate of the officer to the acknowledgment was dated on a Sunday, and this is made a question in the case.

Fayard testified that he had known Saffold for thirty-one years and had lived for some time in the same house with him and was very friendly with him, and that Saffold talked to him frequently of Horne and Humphries and said they had lived with him and worked for him a long time.

House testified that he had known Saffold thirty-five years intimately, and that Saffold had told him he had heard it was said that Horne and Humphries had worked for him and had not been paid, but that he had deeded them an interest in his lands, and he guessed they were satisfied, and witness also said he had heard Humphries speak to Saffold of "our land."

Hubbard Crawfoot testified that he was eighty-one years old; that he had lived in Harrison county since 1852, except two years of the war; that he has been a justice of the peace since soon after the war ended, and that he was a justice of the peace on October 18, 1874, and that he signed officially an acknowledgment to the deed, and that he had first heard of the deed from Saffold to Horne and Humphries about the time of the tax sale. This deposition was taken August 2, 1892, before any question had been made about the acknowledgment having been certified to on Sunday.

On August 8, 1893, after the date of the agreement as to the evidence "taken," Crawfoot's deposition was again taken, and he testified that he did not remember on what day of the week he took the acknowledgment, but that he did not take it on Sunday; that he never did such a thing on Sunday, and

never issued any papers, except warrants and attachments, on Sunday, and that the date of the acknowledgment was *not in his own handwriting*, and he does not know in whose handwriting it is, and that if October 18, 1874, was Sunday, it was not the correct date. That he had been justice of the peace thirty-seven years, and had taken hundreds of acknowledgments, and that he always required either the personal appearance of the parties or their certifying to him that they had signed the deed. He could not swear to the date of acknowledgment, because he did not date it. He never took Saffold's acknowledgment to any deed on Sunday. He says he would not have taken an acknowledgment on Sunday. He has no recollection, particularly, of the fact of this acknowledgment.

Mrs. Martha A. Horne, wife of complainant Horne, testified that she knew Saffold very well; that she and her husband lived in Saffold's house from February to June, 1875; that Saffold visited them at their home in Crystal Springs twice in 1874, and he proposed that they should live with him, because, he said, Horne had as much interest in his property as he had, and he thought Horne should take care of it; that Saffold and her husband were on affectionate terms. Saffold spoke of his property as divided into three parts, and that he owned one, and the other two belonged, or would belong, to Horne and Humphries—she could not remember which. He told Horne that he (Horne) had as much interest in the lands as he had. It is made a point in this case that all of Mrs. Horne's testimony ought to have been suppressed below, on the ground that she, as wife, was incompetent to testify, in a matter where her husband was interested, against the estate of the deceased.

For the defendant, Florian Seal testified that he had been sheriff nine years and had never heard of any claim to the land by Horne and Humphries until after Saffold died, and that Horne and Humphries did not pay taxes on the land while he was tax collector, and that the lands were assessed to Saffold.

A. E. King testified that he wrote a letter to Saffold telling

him that Seal, sheriff, had said there was some paper or record which might give him (Saffold) trouble, and that Saffold answered this letter, saying that Seal was a fool for saying anything about it, as the matter was settled, and that all the lands he paid taxes on belonged to him. Witness destroyed this letter because the letter told him to destroy it. Saffold afterwards told witness that the letter had reference to the Horne and Humphries affair. Witness had judgment against Saffold, and there would not be enough to pay him if Horne and Humphries gained this suit.

W. G. Evans, Jr., testified that the deed in question was among Saffold's papers at the time of his death, and that, as far as witness was informed, Saffold paid the taxes on the land, and that he never knew of Horne and Humphries asserting any title while Saffold lived. Horne knew of the sale of a part of the land to the Union Investment Company. Horne had told witness, after Saffold's death, that while he was in Saffold's house in 1874 Saffold told him to go into an adjoining room and examine a lot of old papers there, and if he found anything of value to preserve it. Among these papers Horn said he found the deed in question, and that he placed it on Saffold's table among other land papers to be executed, and that Saffold brought the bundle of papers down to Judge Crawfoot and acknowledged them, and then gave the bundle of deeds so acknowledged to Horne and told him to give them to the clerk, and that Horne did so. This witness further testified, that at a sale by Saffold of some of the lands to the Union Investment Company, Saffold received a check for $1,800, and that Horne had told witness jocularly that he had jocularly told Saffold that he had better give him the check and let him cash it at Meridian, and Saffold replied that if he had the check cashed he would give Horne some of it, and Horne said he told Saffold that he was just joking, and that he did not want his money.

Divers deeds were introduced in evidence, showing sales by Saffold individually of different parcels of these lands.

W. G. Henderson testified that, as far as his knowledge went, Saffold paid the taxes on the lands, and he does not know that Horne or Humphries paid any taxes on them, and he never heard of any claim on their part until after Saffold's death. He could not say whether Horne knew of the sale to the Union Investment Company, but thinks it was generally known in the town.

The entire deposition of the wife of Horne was excepted to, and moved to be suppressed, on the ground that it is incompetent for a wife to testify against the estate of a decedent to statements of the deceased to her husband in her presence, but the exception and motion were overruled.

Defendants below excepted to certain questions, some of which exceptions were allowed, but the exception was overruled as to interrogatories Nos. 8 and 17, and the answers thereto. Interrogatory No. 8 was, in effect, this: What reason, if any, did Saffold give your husband why he should live with him? and the answer is in these words: "His reason was that Mr. Horne had as much interest in his lands as he had, and he ought to take care of it." Interrogatory No. 17 was, in effect, whether or not she ever heard Saffold speak of the extent and character of his title, and the answer was, in effect, that Saffold spoke of his land as divided into three parts, or that he owned one-third, and that the other two belonged to Horne and Humphries. He either said "belonged to" or "would belong to."

J. P. Caldwell, receiver, testified that he came into possession of Saffold's papers; that they were delivered to him by the chancery clerk, and that he found no power of attorney from Horne and Humphries to Saffold, nor any letters from them or either of them on the subject, and that the name of Horne and Humphries did not appear in any conveyance of land of Saffold. He first saw Saffold's papers in December, 1893, wrapped up in a bundle, tied with a rusty strip of listing, and he does not know how many hands they passed through

before he saw them, and they came into his hands sometime in February, 1894.

The chancery clerk testifies that he has diligently searched the records in his office, and he finds no power of attorney there nor any conveyance purporting to be under any power of attorney. The deed from Saffold to Horne and Humphries, which constitutes the main feature in this case, is in the following words:

"STATE OF MISSISSIPPI, ⎰ Know all men, that I, R. C. Saf-
    Harrison County. ⎱ fold, of the first part, and John W. Horne and Charles Humphries, of the second part, have made and entered into the following contract or agreement, to wit: That I, R. C. Saffold, of the first part, for the consideration of good, true and faithful service, aid and assistance rendered me in my business by the said Horne and Humphries, of the second part, running or commencing from the first day of January, 1866, to the first day of January, 1869, have this day bargained, sold and conveyed to said Horne and Humphries a one-third interest each in all his lands, tenements, etc., situated in Harrison county, state of Mississippi, except his place of residence, commonly known as the Powell place, and the improvements thereon. And he furthermore appoints and constitutes the said Horne and Humphries his administrators or executors, as they are better acquainted with his business than any other persons, and having full confidence that they will well and truly perform the trust confided to them.

"Given under my hand and seal, this first day of April, 1867.              "R. C. SAFFOLD (Seal),
                                 "JOHN W. HORNE (Seal),
                                 "C. HUMPHRIES (Seal)."

And this deed appears duly and properly acknowledged as of date October 18, 1874, before Hubbard Crawfoot, justice of the peace, and its acknowledgment is duly certified to; but October 18, 1874, was Sunday.

The foregoing is the full substance of all the testimony necessary to be set out to give a correct understanding of the questions involved in this case for decision. The court below decreed in favor of the complainants, and the defendants appealed from that decree.

It was not error to hold Mrs. Horne a competent witness. The common law excluded everyone from testifying in his own case, regardless of whether the controversy was *inter vivos* or against the estate of the dead. This was on the ground of public policy, to prevent the temptation to perjury. It also excluded husband or wife from testifying where the other was a party, and this was on two grounds of public policy: First, the ground above mentioned arising out of the doctrine of unity of person and consequent identity of interest; and, secondly, because of the further public policy of protecting inviolably the confidence of the marital relation. 1 Gr. Ev., sec. 334.

The exclusion of husband and wife as witnesses at common law was never put on the ground that the adversary was the estate of a deceased person, but extended to all cases, civil and criminal, just as it did to either in his individual case.

Mississippi abrogated the rule forbidding parties to testify in controversies with living persons by the code of 1857, page 510, art. 190, but expressly excluded them against estates of the dead involving more than fifty dollars. This same code of 1857, page 510, art. 193, enabled husband and wife to be witnesses for each other in criminal cases. This code, therefore, changed the public policy as to individuals being witnesses in their own cases against the living, but, being silent on the subject, left in force the public policy of the sanctity of the confidence of the married relation in all cases whatever, except for each other in criminal cases.

In this state of our statutory law, it was held in 1858, in *Lockhart* v. *Luker*, 36 Miss., 68, erroneously, that, because the statute enabled the husband to testify for himself, the wife was competent, basing the common law exclusion on the sole

ground that the two were one under that system, not noting the ground of public policy because of the confidence of the marital relation. This decision was accordingly overruled, in 1859, by *Dunlap* v. *Hearn*, 37 Miss., 471, in which case it was held that the wife was incompetent as a witness, on grounds of public policy not adverted to in the former decision, and that the code of 1857 did not remove her disability growing out of the sanctity of the marital relation.

In 1860, in *Stuhlmuller* v. *Ewing*, 39 Miss., 447, it was held that a widow was a competent witness for her deceased husband's estate as to conversations between him and the adverse party, because such conversations did not fall within the class of confidential communications excluded by the common law, and because, even at the common law, a widow, not a wife, could testify to facts not coming to her knowledge from the husband in the confidence of married life. This view was adhered to, in 1870, in *Whitfield* v. *Whitfield*, 44 Miss., 254. Of course, in neither of these two cases would the woman have been admitted if her husband had been alive. The point to be noted in these two cases is, that conversations between the deceased spouse and the adversary are not confidential communications in the purview of the common law, and it follows that, as to such, the wife, with a living husband, might testify at his instance, but for the other ground of public policy based on the oneness of the two.

In this condition of the law came the code of 1871, § 756 of which admits interested parties as witnesses against living adversaries, but not against the estates of the dead, and § 760 admits husband and wife for each other "in all civil cases," and § 759 admits them for each other "in all criminal cases." Up to this day they cannot be introduced as witnesses against each other in any case, civil or criminal. It is concluded that the code of 1871 abrogated the common law public policy excluding interested witnesses in contests with living parties, because of temptation to perjury, but retained it as against

estates of deceased persons. It also totally abrogated the common law public policy based on the fiction that husband and wife were one person. It also abrogated the common law public policy of maintaining the sanctity of married life by refusing any testimony of either spouse, and admitted either for the other. Accordingly, it was held in *Rushing* v. *Rushing*, 52 Miss., 329, that a husband, without interest in the subject-matter of the litigation, was a competent witness for the wife against the estate of a deceased person, and in *Barry* v. *Sturdivant*, 53 Miss., 490, this case was cited with approval, and the wife held competent against the estate of a deceased person to establish her husband's claim. Neither of these cases mentions the question of public policy, but, in the nature of things, it must have been considered by the court.

In *Boyd* v. *State*, 57 Miss., 243, it was held that the wife, on grounds of public policy, is not admissible as a witness against her husband in a criminal case, though willing to testify against him. This is no doubt the law also in civil causes, as the statute simply admits her as a witness for him in either, and leaves in force the policy of excluding them against each other, thus preventing marital discord.

The code of 1880, § 1601, and the code of 1892, § 1739, are in these words: "Husband and wife may be introduced by each other as witnesses in all cases, civil or criminal." Immediately following each section is a prohibition against anyone testifying for himself against the estate of a deceased person; but this does not modify the preceding section admitting husband and wife for each other "in all cases." Interest in the result only can disqualify.

*Ellis* v. *Alford*, 64 Miss., 8, is in harmony with these views, and these and the other cases referred to must stand, both because correct on principle and because several legislatures and a constitutional convention have intervened without action on this subject.

The foregoing rather full history of the course of legislation

and adjudication is given in deference to the very strong argument of counsel for appellants against the competency of the wife in this case. It seems too well settled for disturbance now that husband or wife can testify for each other against the estate of a deceased person.

There was no error in admitting the eighth and seventeenth interrogatories to Mrs. Horne and her answers thereto. In answering a preceding interrogatory she had said that Saffold had proposed to her husband to come and live with him, and she was then asked what reason or inducement, if any, Saffold offered for the change of residence. This was a fair and natural question, was not leading, and did not suggest the answer, which answer was that the reason given was that Horne had as much interest in the land as Saffold had, and he thought he ought to take care of it.

The seventeenth interrogatory is equally unobjectionable. This interrogatory was whether she had ever heard Saffold speak of the character and extent of his title to the land, and if so, what be said, and she answered that she had heard him speak of the property as divided into three parts—one of them his and the other two the property of Horne and Humphries; that Saffold had said the two parts either "belonged to" or "would belong to" Horne and Humphries, she did not remember which. This is all proper, and not liable to legal objection.

The court properly admitted the second deposition of Crawfoot, the justice of the peace, to be read in evidence. In a case other than this, involving the same questions, a deposition of Crawfoot and those of other witnesses had been taken, and it was agreed in writing between the *then* counsel that "any and all testimony taken" in the other case, "may be used in this case." Thereupon, afterwards, the pleadings were amended, and it was discovered and set up in both cases that the date of the certificate of the acknowledgment of the deed was Sunday, and then complainants again took Crawfoot's depo-

sition, the reading of which, in this case, is objected to.    To confine the construction of the agreement to holding the word "taken" to the past tense is too rigid.    "Any and all testimony" was to be used "taken" in the other case.    If the strict grammatical sense was designed, the word "heretofore" would naturally have been used before the word "taken." The construction here given was certainly that put upon the agreement by the counsel proceeding with the deposition, and had their minds assented to the narrower construction insisted on, they would inevitably have taken Crawfoot's deposition in both causes.    Grammar should not be permitted by courts of law to override the common understanding of men.    If it did, and the rights of men depended on the accurate use of Murray's grammar, it is to be feared that some of our professional brethren would often ruin their clients.    The fact that counsel for defendants were changed after the agreement cannot disturb its binding force.    It stood until rescinded.

In examining the facts, the deed first presents itself for consideration.    It is very peculiar—*sui generis*, in fact—and it is to be hoped will not be the father of a family of such instruments.    It is, however, on the part of Saffold, as has heretofore been determined by this court, a deed, and not a will nor a conveyance in trust on its face.    It is, so far as Saffold is concerned, a conveyance to Horne and Humphries, to take effect at once, in consideration of services rendered and to be rendered by them.    It is quite significant that the instrument itself and the certificate of acknowledgment that it was signed, sealed and delivered were written by Saffold himself.    It is also significant that it got out of the hands of Saffold, and into the hands of the chancery clerk, and was recorded on the deed books of the county.

Not only are these facts certain, but it is also true that Horne and Humphries both signed and sealed the same instrument. Whether there was any occasion for them to sign it or not, is a different question, but the fact remains that they did sign it.

Horne, Humphries and Saffold all lived in the same house, and this takes away, in some measure, the force of the position against delivery, that it was in Saffold's possession when he died.    In one view, this instrument is trilateral.    Saffold certainly signed it, and, manifestly, it must have passed from his hands into the hands of Horne and Humphries for them to sign it.    Now, the consideration recited in the deed by Saffold for his conveyance of the land was services already rendered and services to be rendered by Horne and Humphries.    If the deed had been found in the possession of either Horne or Humphries, and Saffold had called on them to perform the services to be rendered, the party in whose possession it was being dead, it could not be the law that nondelivery could have been set up, because of this mere fact, to defeat Saffold's claim for services. We do not hold now the correlative as to Saffold, the grantor *in præsenti,* but allude to these matters as circumstances tending to show that his possession of the deed was not inconsistent with delivery.    The fact that the acknowledgment appears dated on a Sunday, is of small moment in the case on the question of delivery or nondelivery.    We are inquiring now into what the actions of Saffold were, and their legal bearing as circumstances in determining whether he delivered the deed, and we are not inquiring into the question of the validity of the record of the deed, the certificate of acknowledgment of which bears date on Sunday, nor into the effect of such record on innocent purchasers without notice.

No trust is indicated as any part of the consideration of this deed, and the law cannot hunt for trusts not expressed or distinctly proved.    It is shown that Saffold was very fond of Horne and Humphries, and it may be he thought he was making a will, but there is no proof of this, and the instrument is not a will, and Saffold is shown to have been an intelligent man.

After the execution of the instrument he is shown to have recognized the interest of Horne and Humphries in the lands in several different conversations, some of which were had with

persons with no sort of interest in the controversy.    These facts, and these presumptions from facts, are not outweighed by the other facts in the case.    Other statements of Saffold, and the fact that he sold parcels of lands in his own name, and that he paid taxes on them, do not overthrow the proof of delivery.    The presumption of delivery from the facts in this case, in the absence of any tangible proof of fraud, are not to be overcome by "fragmentary and equivocal evidence."    *Neblett* v. *Neblett*, 70 Miss., 572.

The acts of ownership by Saffold have not infrequently characterized the conduct of men who had no valid claim to the sole ownership.    Courts should not enter the field of surmise or conjecture to defeat the acts of parties under the solemnity of a deed.

It cannot be said that the court below erred, either on the law or the facts, and its decree is

*Affirmed.*