MARSH v. PREFERRED ACC. INS. CO.

SAME v. NEW YORK LIFE INS. CO.

Nos. 7159, 7160.

Circuit Court of Appeals, Sixth Circuit.
May 13, 1937.

Gerald Pilliod, of Cleveland, Ohio (Payer, Corrigan & Cook, of Cleveland, Ohio, on the brief), for appellant.

C. M. Vrooman, of Cleveland, Ohio (Garfield, Cross, Daoust, Baldwin & Vrooman and Arthur D. Baldwin, all of Cleveland, Ohio, on the brief), for appellees.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

These actions were brought by appellant, the widow of John C. Marsh, to recover on two insurance policies for his accidental death. The first, for $5,000, was upon accident policy No. 859,591 of appellee the Preferred Accident Insurance Company; and the second, for $12,000, on a provision of life insurance policy No. 9,578,272 of New York Life Insurance Company, contracting to pay double indemnity in case death resulted from bodily injury occasioned solely by accidental means. A ver-

dict was directed for the defendants, and the sole question is whether certain evidence offered by appellant was properly excluded.

Mr. and Mrs. Marsh lived alone in a two-story house. A stairway led from the front hall to a landing and thence by ten additional steps to the second floor hall. There was a balustrade on the left side going up and a wall on the right. A light switch was set in this wall about three feet above the first step going down. This switch was for the light which illuminated the upper hallway and could be easily reached by any one on the top floor. Marsh occupied a bedroom opening off the upper hall on the right as one ascended the stairs. Mrs. Marsh occupied a connecting room. The bath was at the rear end of the hall. At the head of the stairs there was a folding screen in three sections.

Marsh retired about 10:30 p. m. March 16, 1933, but before doing so he placed this screen in the stairway. A short time later Mrs. Marsh went downstairs to lock the house and on her return replaced the screen in the stairway. She then retired. She testified that between 3:30 and 4 a. m. she heard a terrible crash, went to the head of the landing, and looked down the stairway. At this point she offered to give the following additional testimony: "Mr. Pilliod (Dictating to reporter): I found my husband lying on the landing at the foot of the stairs, and the screen had folded up and fallen down. He was lying on the left side of the screen. The screen had fallen, tipped over and fallen on the landing. That was lying on the right side; he on the left. Of course I rushed downstairs. As I came out of my bedroom I shouted: 'What·was that? What happened?' When I saw him lying there I ran ·downstairs and he said 'I stumbled on the screen and fell downstairs, and I must be terribly hurt; I can't stand.'"

The court ruled that this evidence was prohibited by section 11494, subsection 3, of the Ohio General Code.[1]

The court was of the opinion that this statute would not permit Mrs. Marsh to testify, either to any communication made by her or her husband, or to any act done by either of them not·in the presence of a third person; that if the statute needed any construction it was to be found in the interpretation placed upon it by Dick, Exec., v. Hyer, 94 Ohio St. 351, 114 N.E. 251, and Commercial Gazette Co. v. Grooms, 10 Ohio Dec. 489. The Commercial Gazette Case is not a decision by the Supreme Court of Ohio and we do not think that Dick, Exec., v. Hyer is susceptible of the interpretation placed upon it.

In Ohio the syllabus of an opinion of the Supreme Court is the law of the case and syllabus 2 of the Dick Case is as·follows: "2. A husband or wife cannot testify as to the contents of a written paper, handed by one to the other and examined and signed in the presence of each other during coverture, unless it is done in the known presence or hearing of a third person competent to be a witness."

We think this syllabus bears little analogy, even were analogy pertinent, to the question presented, and until there is a more authoritative declaration by the Ohio Supreme Court as to the meaning of the statute when applied to circumstances such as are here involved, we feel at liberty to place our own interpretation upon it. Our view is strengthened by pertinent comments upon the statute in Holtz v. Dick, 42 Ohio St. 23, 26, 51 Am.Rep. 791.

The headnote to section 11494 is "Privileged communications and acts." In addition to subsection 3, the section deals with communications between attorney and client, physician and patient, and with confessions made to a clergyman or priest.

In Dick v. Hyer, supra, the Supreme Court said: "The evident purpose of this provision [paragraph 3 of section 11494] is to keep sacred and secret the confidential relations of husband and wife." The court further said: "If it comes within the class of communications between husband and wife that are regarded as confidential, the law throws a veil of secrecy over it forever."

Assuming that the strict letter of the statute must prevail, and that all communications between the husband and wife

---

[1] "§ 11494. Privileged communications and acts.—The following persons shall not testify in certain respects: * * * 3. Husband or wife, concerning any communication made by one to the other, or an act done by either in the presence of the other, during coverture, unless the communication was made, or act done, in the known presence or hearing of a third person competent to be a witness. The rule shall be the same if the marital relation has ceased to exist."

and all acts done by either in the presence of the other are confidential unless made or done in the presence of a third person, still we think it was error to exclude the evidence of what Mrs. Marsh saw from the head of the stairway. The court permitted her testimony that she looked. What she saw, as the result of looking, was not an act either of herself or her husband, who was quiescent. What she saw, was his plight and condition which was the resultant of movement or activity, occurring before she arrived in a position to see.

█ Moreover, we are confident that the Legislature intended no such drastic consequence as the exclusion of all transactions or communications between husband and wife, however unconfidential or unsecretive in nature, simply because they were not voiced or done in the presence of a third person. Such a proposition so shocks the moral sensibilities and logical sense of all reasonable men as at once to warrant the conclusion it was never intended. The resulting injustice and oppression cannot be better illustrated than by the facts of this case. No reason consistent with the commonly accepted principles of right and justice can be found to support it.

The District Judge thought it singular that such was the law, but felt himself bound to give literal application to the words of the statute, and no doubt certain general expressions found in the opinion, not the syllabus, of Dick v. Hyer, supra, were regarded as weighty.

█ At common law, it is the settled rule, on grounds of public policy, that neither the husband nor wife shall be allowed to testify as to the conduct or conversation of either occurring within the frankness and freedom of confidential intercourse, the disclosure of which would betray conjugal confidence and trust.

When the letter of the statute is considered in connection with the absurdity of the result, it becomes evident that the enactment did not intend to change the common law rule. It is a commonly accepted canon of construction that the intent, not the letter, of the statute constitutes the law, that a thing may be within the letter of the statute but not within its meaning.

Stewart v. Kahn, 11 Wall. 493, 504, 20 L. Ed. 196; Raymond v. Thomas, 91 U.S. 712, 715, 23 L.Ed. 434; Indianapolis & St. L. R. Co. v. Horst, 93 U.S. 291, 300, 23 L.Ed. 898. In United States v. Farenholt, 206 U.S. 226, 229, 27 S.Ct. 629, 631, 51 L.Ed. 1036, the court said: "A court is not always confined to the written word. Construction sometimes is to be exercised as well as interpretation. And 'construction is the drawing of conclusions respecting subjects that lie beyond the direct expression of the text, from elements known from and given in the text,—conclusions which are in the spirit, though not within the letter, of the text.'" In the absence of any other reason or purpose for it, we must conclude that the statute must be read in connection with the common law and as an expression of it. If this be true—and we see no escape from it—[New York Life Ins. Co. v. Mason, 272 F. 28, 32 (C.C.A.9); In re Van Alstine's Estate, 26 Utah, 193, 72 P. 942; Gifford v. Gifford, 58 Ind.App. 665, 107 N.E. 308, 311; Bradley v. Quinn, 53 R.I. 349, 166 A. 814; Ward v. Oliver, 129 Mich. 300, 88 N.W. 631; Sexton v. Sexton, 129 Iowa, 487, 105 N.W. 314, 2 L.R. A.(N.S.) 708; Wigmore on Ev., Vol. 4, § 2336, p. 3264], the rejected evidence is relevant. The outcry, "What was that? What happened?" was not shouted in confidence; it was a spontaneous outburst caused by the crash. It was part of the res gestæ. The discovery by Mrs. Marsh of her husband's plight and the overturned screen was in no sense a confidential disclosure. If she spoke the truth, any other person, located as she was, would have made the same observation. The statement of the deceased, "I stumbled on the screen and fell downstairs and I must be terribly hurt; I can't stand," was admissible. It was made immediately after the crash and as soon as Mrs. Marsh could run to him. The proposition needs no other support than Travellers' Insurance Co. v. Mosley, 8 Wall. (75 U.S.) 397, 403, 19 L. Ed. 437. There is nothing in the statute involved to indicate that the Legislature intended to abrogate the res gestæ rule.

With the excluded testimony admitted there was substantial evidence for the consideration of a jury.

The judgments are therefore reversed, and the cases are remanded for a new trial.