## SPIVEY et al. vs. PLATON, Adm'r.

1. EVIDENCE: *Wife's competency as a witness.*
   After the husband's death, the wife is competent to testify as to such matters, touching his business, as come under her observation during the husband's life, and were not learned by communications from him.

2. — *When the source of information not disclosed.*
   Where a witness testifies as to a fact without disclosing the source of his knowledge, the court will not exclude his testimony on the presumption that it is hearsay ; but it will attach less weight to it than it would if the means of information had been stated, or it had appeared to have been stated from personal knowledge.

3. PLEADING: *Departure in.*
   Where the plaintiff's answer to a cross bill is in some respects modified, but asserts substantially the same proposition as the complaint, there is no departure in pleading.

APPEAL from *Monroe* Circuit Court.
Hon. W. H. H. CLAYTON, Circuit Judge.
*Hughes*, for appellant.
*Tappan & Horner* and *Palmer & Sanders, contra.*

ENGLISH, C. J. In October, 1869, Madaline P. Lindsey as administratrix of her deceased husband, Daniel P. Lindsey,

filed a bill in the Monroe circuit court to enforce a lien for purchase money upon lands sold by her husband, while living, to Robert H. Pasley and John Spivey.

Before the final decree, Mrs. Lindsey's letters were revoked by her marriage, and Emele Platon, who succeeded her in the administration, was substituted as plaintiff.

The original defendants to the bill were Pasley and Spivey, the purchasers of the lands, and the assignee in bankruptcy of Pasley. But in the answer and cross-bill of Pasley, he alleged that he had repurchased his interest in the lands, at a sale made by his assignee, and no further notice seems to have been taken of the assignee. During the progress of the cause, the death of Pasley was suggested, and his administrators and heirs were made parties.

A personal decree was rendered against Spivey for part of the debt sought by the bill to be charged upon the lands, and a decree against the lands for the remainder of the debt, and they were directed to be sold by a commissioner for the amount charged upon them.

Spivey appealed to this court, and by an order made here, Wm. W. Smith, administrator *de bonis non* of Pasley, was, on his motion, permitted to join in the appeal.

I. Whilst Mrs. Lindsey was plaintiff, her deposition was taken, a motion was made by the defendants below to suppress it, on the grounds that she, as administratrix of her deceased husband, was the plaintiff in the suit, and her deposition related exclusively to transactions had with, or statements made to, or by her intestate. The motion was overruled by the court.

A subsequent motion was filed to exclude her deposition on the grounds stated in the motion to suppress, and on the additional grounds that it related to communications made to her by her husband, during the existence of the marriage relation

between them; and that a portion of the deposition was open to the objection of being hearsay, etc.

The record discloses no action of the court upon this motion. It was filed May 6, 1872, and the final decree was rendered January 27, 1874. The decree recites that the cause came on to be heard "upon the complaint, answers, cross-complaint, and replies thereto, with the exhibits and the testimony."

If any oral testimony was introduced on the hearing, it was not put upon the record. The deposition of Mrs. Lindsey is the only one in the transcript before us, and the court having overruled the motion to suppress it, no doubt treated her as a competent witness, and in making up its decree, gave effect to such portions of her testimony as were deemed relevant and competent to the matters in issue.

By the common law, Mrs. Lindsey, being the plaintiff in the suit, was an incompetent witness to give evidence in her own favor. *Grimes, Adm'r, v. Booth*, 19 Ark., 227.

But by the constitution of 1868, her incompetency by reason of her being a party to, or interested in the suit, was removed:

"In the courts of this state there shall be no exclusions of any witness in civil actions because he is a party to, or is interested in the issues to be tried." Art. VII, sec. 22.

Mrs. Lindsey was a competent witness, but whether, in her deposition, she stated matters which she was incompetent to disclose, by reason of her former relation to her deceased husband, is another question.

The code provides that the following persons shall be incompetent to testify:

*First:* Persons convicted of capital offenses, perjury, etc.

*Second:* Infants under the age of ten years, etc.

*Third:* Persons of unsound mind, etc.

*Fourth:* "Husband and wife, for or against each other, *or concerning any communication made by one to the other during*

*the marriage, whether called as a witness while that relation sub-sisted or afterward."* Gantt's Dig., sec. 2488.

So much of this clause of the statute as we have copied in *italics* is but declaratory of a familar and well settled common law rule of evidence.

"Communications between husband and wife (says Mr. Greenleaf) belong to the class of privileged communications, and are therefore protected independently of interest and identity, which precludes the parties from testifying for or against each other. The happiness of the married state requires that there should be the most unlimited confidence between husband and wife; and this confidence the law secures by providing that it shall be kept forever inviolable; that nothing shall be extracted from the bosom of the wife which was confided there by the husband. Therefore, after the parties are separated, whether it be by divorce or by death of the husband, the wife is still precluded from disclosing any conversations with him, though she may be admitted to testify to facts which came to her knowledge by means equally accessible to any person not standing in that relation." 1 Greenl. Ev., sec. 254.

Mrs. Lindsey's deposition is in substance as follows:

That she knew that Lindsey, in his life time, sold lands to Pasley and Spivey, and also, at the same time, twelve slaves, for the sum of $23,000. The lands and slaves were valued separately, but it was the same transaction, and the aggregate price was the sum above stated. Of this sum, one-third was to be paid in cash, and the balance in one and two years.

The first, or cash payment, was to be made in January, 1860. About the 5th of that month, Pasley and Spivey paid to Lindsey, $2,750, and he took back one of the negroes which he had sold to them at $1,300, and they, not being able to make the balance of the cash payment, executed their joint note to

him, for $2,616, with ten per cent. interest from date. For the deferred payments, they executed their two notes for $7,666.66, payable to the order of said Lindsey, one and two years after date, respectively; and he executed and delivered to them a title bond, conditioned to make them a deed to said lands on · payment of said notes. In regard to the time of the sale of the lands and the execution of the notes, she did not speak from her own knowledge, but from information derived from the parties, and her recollection of the notes, having seen them, handled them, and calculated the interest on them frequently; and she states positively that the notes were for the amount above stated, and she knew the price of the lands and negroes was included in the notes.

That at the time of the sale, Lindsey was indebted to one Halloran for the lands and a portion of the negroes, in about the sum of $4,000, part of which Pasley paid off for Lindsey; and Lindsey also took back from Spivey and Pasley seven of the negroes, valued at $4,900. Pasley also paid one Beard about $1,500 for a negro woman and child. Lindsey also purchased goods of Spivey and Pasley, but amount not recollected. After these payments, there was a settlement between Lindsey and Spivey and Pasley, at which witness was present, and made the calculations. Credits were given them for all the amounts they had paid as above stated, and there was a balance then found due from them to Lindsey on said three notes of $4,214.33, and in order to close the matter and fix definitely the amount, at the request of Pasley, Lindsey delivered up the original notes and took the note of Pasley and Spivey for said balance, which is the note sued on in this case, and represents the balance due on the lands and the four negroes retained by them, the other eight having been taken back as above stated. This settlement witness made herself, and delivered up the notes; that is, she made all the calculations,

and at the request of Lindsey, delivered up the notes to Pasley and Spivey. Afterward they paid $75 on the new note, which was credited February 8, 1866, and on March 26, 1866, they gave an order on H. P. Coolidge for about $500, which was credited on said note, and Lindsey included in the credit one-half of the interest which had accrued on the note [it bore date January 1, 1862], making the credit $1,493.17, which was all that had ever been paid on the note. After said payment, Pasley applied to Lindsey for a deed to half the land, stating he had paid out of his own means more than half the purchase money, and desired Lindsey to look to Spivey for the balance, which he declined to do, as they were both bound to him for the money.

There appears to be nothing in this deposition falling within the description of such confidential communications from the husband to the wife, as by the common law, or the statute above quoted, the wife was forbidden to disclose as a witness, being, after the death of the husband, otherwise competent. *McGuire v. Maloney*, 1 B. Monr., 224.

The court below did not err in overruling the motion to suppress the deposition.

II. The part of the deposition of Mrs. Lindsey which the counsel for appellants insist is open to the objection of being hearsay, is that part in which she states that "for the deferred payments (on the land and negroes), they (Pasley and Spivey) executed their two notes for $7,666.66, payable at the order of Lindsey, one and two years after date, respectively; and he executed and delivered to them a title bond, conditioned to make them a deed to said lands on the payment of said notes."

The objection is, that as she does not state that she was present when the bond for title was executed, or that she ever saw it, the inference is that she had no personal knowledge of its condition, and must have made her statement on informa-

tion derived from others. This may be true, but she states a fact, and if the opposing parties desired to have her state the source from, or means by which she derived her knowledge of the fact stated, they had an opportunity of doing so by cross-examination. But having neglected to cross-examine her, it would not be fair to exclude her statement of a fact altogether, because she does not disclose the source of her. knowledge of the fact stated. But of course the court, in making up its decree, will always attach more weight to the statement of a fact when it appears to have been within the personal knowl--edge of the witness or when the source or means of the knowledge is stated, than where the fact is merely stated, and it does not appear to have been within the personal knowledge of the witness, and the source or means of information is not disclosed; and the court below must have acted on this rule in making up the decree in this case. For Mrs. Lindsey stated that the title bond was conditioned that her husband would make a deed to the lands, on payment of the two notes given for the deferred installments of the purchase money of the lands and the negroes. The bond had been stolen by a burglar from Pasley's store, and was not produced. It does not appear that any other witness testified in the cause. If the court had given full credit to this statement of hers, it might well have charged on the lands the whole amount found to be due on the note in suit. But the court did not so decree. It found that the parties had made no appropriation of the payments, and appropriated them *pro rata* upon the slave debt and the land debt, and rendered a personal decree against Spivey for the sum ascertained to be due on the slaves (not taken back), Pasley having been discharged in bankruptcy, and charged upon the lands the balance found to be due on them. And this appears to be a fair decree, and as favorable to appellants as the pleadings and evidence warranted.

III. There is a further question in relation to an alleged departure in pleading.

The original bill is brief and not accurate in its allegations. It appears to have been drawn and sworn to by the solicitors of Mrs. Lindsey, who had the note sued on for collection in her absence.

It says nothing of the sale of the negroes, but states the sale of the lands, leaving the date of the sale in blank, and avers that the note sued on was either one of the original notes executed for the lands by Pasley and Spivey or taken in renewal of the last of said notes, the sole consideration for the note sued on being said lands, etc.

The main purpose of the bill was to charge the debt as a lien upon the lands, and to obtain a decree condemning them to be sold to pay it.

Pasley and Spivey made their answers cross-bills, in which they affirmatively alleged that they purchased at the same time lands and negroes of Lindsay, and gave separate notes for the agreed price of each; that the land note was paid and the note sued on given in renewal of an unpaid balance of the slave note, which they insisted was a personal debt, constituting no lien on the lands, and prayed for title to the lands.

Mrs. Lindsey, who seems to have understood the facts of the case better than her solicitors did when they drafted the original bill, answered the cross-bill, admitting the sale of negroes and lands, denying that separate notes were taken for the agreed price of each, but stating the transaction substantially as she afterward did in her deposition. There was a demurrer to her answer to the cross-bill on the ground of departure in pleading, which the court overruled.

The alleged departure is this, that in her bill she avers that the note sued on represents a balance due on the lands, while

in her answer to the cross-bill, she admits that the note sued on represents a balance due on the lands and negroes both.

This is true, but she also states in her answer that the condition of the bond for title was that the deed for the lands was to be made on payment of the notes given for the purchase money of both the lands and the slaves, so that by a different mode of stating it, she comes back substantially to the main proposition of the bill, that the note sued on was a lien upon the lands, and that they should be condemned to satisfy it.

In the common law system of pleading, a departure is said to be when a party quits or departs from the case or defense which he has first made, and has recourse to another. It occurs when the replication or rejoinder, etc., contains matter not pursuant to the declaration or plea, etc., and which does not support or fortify it. Chitty Plead., 644.

Mr. Newman says : " The code requires that the new matter set up in reply shall not be inconsistent with the petition. It seems to have been supposed that this rule was adopted in analogy to a rule under the former practice, which authorized a demurrer when the replication, or any subsequent plea, was a departure from the original cause of action set out in the declaration. But our code allows no reply to new matter alleged in the answer unless it constitute a counterclaim or set-off. The reply must therefore refer only to the new cause of action set up by the defendant, and the rule cannot have been adopted in our code for the purpose of preventing a departure. It was no doubt adopted merely because the plaintiff in his reply should not be permitted to contradict the material allegations which he had previously made in his petition. Such inconsistency, it seems, therefore, is not a ground of demurrer, as was a departure in pleading formerly, but is a ground of objection to such a reply being filed, or, if it has been filed, it is good reason for a motion to strike out the inconsistent mat-

ter." ' Newman Plead. and Pr., 685; Gantt's Dig., sec. 4579–80.

Be the code practice as it may, we do not think that Mrs. Lindsey made any very serious or substantial departure in her pleadings in this case.

The decree must be affirmed, and the affirmance certified to the court below, that the decree may be executed.