[Civil No. 3002.  Filed June 2, 1931.]

[299 Pac. 679.]

L. C. McNABB, Administrator of the Estate of JOHN FISHER, Deceased, Appellant, v. GURIE FISHER and THE VALLEY BANK, a Corporation, Appellees.

Messrs. McNabb & DeCamp, for Appellant.

Messrs. Dougherty & Dougherty and Mr. James A. Walsh, for Appellee Fisher.

ROSS, J.—This is an action by L. C. McNabb, the administrator of the estate of John Fisher, deceased, against Gurie (G. W.) Fisher, a son of John Fisher, and the Valley Bank, to recover from the bank a balance of a deposit made therein, a short time before John Fisher died, in the name of the deceased and his son G. W. Fisher, payable to either or the survivor. The bank answered that it was ready to pay the money to whomsoever the court ordered it paid. Gurie Fisher answered by way of specific and general denials. The court, after hearing the evidence, decided the case in favor of defendant Gurie Fisher and ordered the bank to pay such deposit to him. The administrator has appealed.

There is no question but that every dollar of the deposit was at one time the property of the deceased. This is conceded, but defendant contends that the money is his; that it was given to him by the deceased.

It is settled in this jurisdiction that, if the evidence substantially supports the trial court's findings and conclusions as to the facts, we will not disturb them. In other words, if the evidence was in conflict as to whose property the money was, the decision of the

trial court will be accepted by the appellate tribunal as final.

The gift here, if there be one, is what is known as a gift *inter vivos*. It differs from a gift *causa mortis* in that it is irrevocable, whereas the latter may be revoked at any time before the donor's death. 28 Corpus Juris, 622, § 6. Essential elements of a gift are that the donor manifest a clear and unmistakable intent to give the property to the party claiming as donee, and that he pass to the latter before his death the possession and control of the thing given. Mere intention to give is not enough, nor is change of possession or control; these must concur.

The plaintiff's position is that, taking the testimony in its strongest light in favor of defendant, there was no gift, because there was shown no intention to give nor any surrender of control to Gurie Fisher.

The undisputed evidence is that John Fisher was an old man and in need of someone to look after him and his affairs. He had lived some thirty-five years at Black Rock, Graham county, Arizona, and owned a small herd of cattle and some mining locations. On or about 1927 or 1928 two of his daughters and their husbands and families, and Clem Fisher, a son, came from Oklahoma to Graham county. In November of 1928 defendant Gurie appeared on the scene. They all joined the old gentleman in an effort to develop his mines, but lost their time, labor and money, as the mines proved worthless. Gurie was with his father most of the time after he arrived. The other children lived with their families. In June of 1929 the father sold his cattle and deposited the sale price to his account in the Safford branch of the Valley Bank. At that time his total deposit was around $1,900. Because of the father's poor and illegible writing, it was necessary that someone fill out his checks. This was usually done by the cashier, the father signing

them. Some talk was had about having someone else empowered to write and also sign checks against his deposit, at Safford, but no arrangements were in fact made. In September, 1929, the father and defendant Gurie went together on a visit to Texas and Oklahoma, states where they had formerly lived. Gurie had no money whatever, and his expenses on this trip were paid by the father. Before going, the father drew out of the Safford bank all of his deposit, taking in lieu thereof $75 in traveler's checks for expenses and the balance in a cashier's check payable to himself. This check, at Drumwright, Oklahoma, was deposited in the Drumwright State Bank to the father's account. Some of it was drawn out for expenses there and in returning home, and a cashier's check, payable to the order of G. W. Fisher, taken for the balance of $1,577. The father and son came to Mesa, Arizona, along in November, 1929, and on the 15th of that month Gurie left for collection with the Mesa branch of the Valley Bank the cashier's check above described. After its collection and on November 25, 1929, he returned to the bank with his father, and they opened an account in their joint names, thus: "Deposited by John or G. W. Fisher" $1,526.60. G. W. (Gurie) Fisher stated to the bank official that "'they wanted a joint account so either he or his father might draw on it as occasion required.'" A card was made out by the bank official expressive of their wishes, and they signed it "John Fisher" and "G. W. Fisher." This card in general terms provided that either of the persons so signing or the survivor of them could draw against the deposit.

Gurie, on his direct examination concerning the Drumwright cashier's check and how it happened to be made to him, testified in his own behalf as follows:

"Q. Where was this check issued to you? A. At Drumwright, Oklahoma.

"Q. What were the conditions under which it was issued? A. Well, I drawed out what money — I bought a cashier's check on account of getting robbed or anything you know.

"Q. With reference to this amount represented here, being $1577.00, what understanding or conversation did you have with your father John Fisher with reference to that? A. He told me to bring back what I wanted to. I wanted enough cash, and the rest in a cashier's check to bring it back safe.

"Q. What was said, if anything, about the money or check being made to you? A. There wasn't anything said. He told me to get what money I wanted and get a cashier's check.

"Q. At any time what was said between your father and yourself with reference to this check? A. He said this was my money and he would sign it over to me to take care of him as long as he lived.

"Q. When you got back to Mesa and made this deposit in the bank how did you come to make this a joint deposit? A. I told father I wanted him to go up to the bank, I wanted to give him authority to check on my account, that I might take down sick or something and he would have a little assistance when he needed it."

On cross-examination, he stated his father had told him on their way to Texas he was going to give him this money, and had repeated such intention many times on such trip. He also said his father told him, " 'This amount now will just take care of me as long as I live,' and he told the cashier (at Drumwright) to send me the check." In another place he said: "I say the big check was his until he cashed it out and he give it to me to take care of him as long as he lived. He told the bank to send me the check on." He also said he had entire control of the bank account, and that, although he consulted his father about drawing checks, he did not have to do so. He admitted his father had the same right to draw against the fund as he had.

From this evidence the court found (1) "as a fact . . . that said money and every part thereof was delivered . . . to . . . Gurie by his father . . . some time prior to the death of John Fisher, as a gift . . . with the intention . . . that said money should be and become the sole and separate money and property of Gurie Fisher"; and (2) that the deposit in the Valley Bank of Mesa was of his (Gurie's) sole and separate money and property. Is there evidence to support these findings?

Gurie Fisher in his brief says the gift was completed when the check of the Drumwright bank was made to him instead of the father. It evidently is to that occurrence the court refers in the finding wherein it is said the gift was made "some time prior to the death of John Fisher." Gurie's testimony, however, as to why or how the check was made in his name, lends nothing to the gift theory or claim. In answer to the question, by his own counsel, "What was said, if anything, about the money or check being made to you?" he said: "There wasn't anything said. He told me to get what money I wanted and get a cashier's check." So it appears the check was made payable to Gurie without any direction or instruction whatever from the father. And when he was asked, "At any time what was said between your father and yourself with reference to this check (Drumwright bank check)?" his answer was, "He said this was my money and he would sign it over to me to take care of him as long as he lived." These statements by Gurie are the only evidence of a surrender of control or dominion over the money by the father. They do not show either a manual or symbolic delivery of the money. The best they show is that the son, without authorization from his father, had the check made in his own name. The evidence fails to show that the father directed the Drumwright bank to give to his

son title and constructive possession of the father's deposit in the Drumwright bank by issuing, or causing to be issued, to the son the cashier's check covering such deposit. It is not shown that the father ever knew that such a thing had taken place. Indeed, the son's testimony is that his father said he *"would* sign it over," not that he did sign or had signed it over. We gather from the son's testimony that the father had entrusted him to get from the Drumwright bank, in convenient and safe form for transmittal to Arizona, whence they were going, the funds deposited, that the son thereupon took a small portion of such funds in traveler's checks to defray expenses and the balance in a cashier's check payable to himself, and that he neither consulted his father before nor advised him thereafter of the attempted change of title.

As we understand it, the surrender by the owner of the dominion and control of his property must be voluntary and intentional or it will not amount to a gift.

We conclude there is no evidence to support the court's finding that there was delivery of possession and control of the deposit from the father to the son "some time prior to the father's death." It follows that the first finding was erroneous, and, since the second is based upon the first, it likewise was erroneous. The legal control of the Drumwright cashier's check, at the time of its deposit in the Valley Bank of Mesa for collection, was in the father; and the title of the receipts therefrom later placed on deposit to the joint credit of the father and son, was likewise in the father and remained so until the time of his death, unless the bank deposit in their joint names had the effect of a gift *inter vivos* of such deposit from the father to the son.

What effect should be given a deposit by the owner of money in his name and another, or the survivor of them, has been a question upon which the courts have not agreed. The cases bearing upon the question are collated in a note to *Deal's Admr.* v. *Merchants' & M. Sav. Bank* (120 Va. 297, 91 S. E. 135) in L. R. A. 1917C 548 et seq., and in a note to *Cleveland Trust Co.* v. *Scobie* (114 Ohio St. 241, 151 N. E. 373) in 48 A. L. R. 182, at page 189, et seq. Without attempting to explain or analyze these cases, we think 'the deduction made from the decisions upon that question by the author in 28 Corpus Juris, 664, section 64, is about correct. It is as follows:

"Where a person deposits money in a savings bank to the credit of himself and another, and payable to the order of either or the survivor of them, with the intention of making a gift, such deposit vests in the donee a joint interest with the depositor in the fund, and upon the death of the depositor the survivor is entitled to the amount then on deposit. The controlling question always hinges upon whether the owner of the money intended to make a gift or whether the account was entered in joint form for other purposes. The intention to make a present gift of a joint interest in such deposit may appear in the statement of the depositor, or it may be shown by his acts and the attendant circumstances. The mere opening of a joint account, each having an equal right to draw, does not, in and of itself, establish a gift."

As indicated, the intention of the depositor is controlling. If the intention to make a gift is clear, definite and certain, the courts have not permitted a divided control of the deposit to defeat the gift. Sometimes intention may be gathered from the statement accompanying the deposit and sometimes from the acts of the parties and the attendant circumstances. This vital point must depend upon the particular facts in each case.

With this rule in mind, let us turn to the donative language testified to by Gurie Fisher. We think when it is analyzed it simply means that the father was turning this money on deposit over to the son to be spent and used in the care of the father as long as he lived. There is no clear statement that the father was giving such fund to the son for the use of the latter, but at most that it was for the common use of the two. The father said: "This amount now will just take care of me as long as I live." This language would indicate that the father expected to expend or have this money expended for himself. He states his father's donative words in another place as follows: "He said this was my money and he would sign it over to me to take care of him as long as he lived." According to this language, the father was entrusting the son with such money, to be paid out in the father's care. If it was given to the son at all, it was for that specific purpose. It was not given to the son to be used as he pleased and for his own personal account. Under his own statement he was acting in a trust relation for the benefit of his father.

If, however, it be granted that the donative language of the father imported an intention on his part to give outright to the son some interest in the deposit, at most it would consist of that portion left after the father's death. If the intention was that the gift should take effect only after the death of the father, it would be ineffectual, because that would be an attempted testamentary disposition of property, which can be accomplished only by means of a valid will. *Barstow* v. *Tetlow,* 115 Me. 96, 97 Atl. 829; note to *Cleveland Trust Co.* v. *Scobie,* 48 A. L. R. at page 198.

It is significant that the son laid no claim to the deposit until after the father's death, and only drew

checks against the fund to meet his father's needs. If he ever drew a check for his personal needs before his father died, it is not shown by the record.

John Fisher was an old man, with no means to live on other than this bank account. It is not reasonable to assume that he would deprive himself of this sum by giving it to his son outright. Of course he could have done such a thing, but the evidence falls far short of showing that he did, or intended to do, such a thing. On the contrary, it quite conclusively shows the father at most intended the son to have, if anything, what might be left at his death. It was not intended as a gift *in praesenti* to the son, and must fail as a bequest, if such were intended, for the reason above stated.

This is not a question of disputed or conflicting evidence, but a total lack of evidence supporting a gift. A very salutary rule is that, when a claim of a gift is not asserted until after the death of the alleged donor, it should be sustained by clear and satisfactory evidence of every element requisite to constitute a gift. The reason for the rule is stated in a Maryland case as follows: "Mindful of the facility with which, after the alleged donor is dead, fraudulent claims of ownership may be founded on pretended gifts of his property asserted to have been made whilst he was living, it is but a salutary precaution which demands explicit and convincing evidence of every element needed to constitute a valid donation whether it be a donation *inter vivos* or *mortis causa*. Even then, fraudulent claims may prevail, but the rigid requirement of the clearest proof will at least diminish the number." *Whalen* v. *Milholland*, 89 Md. 199, 44 L. R. A. 208, 43 Atl. 45—and quoted with approval in *Sullivan* v. *Shea*, 32 Cal. App. 369, 162 Pac. 925.

For the reasons above stated the judgment of the lower court is reversed and the cause remanded, with

directions that judgment be entered in favor of the administrator, directing the defendant bank to pay said sum of money, together with interest, if any, to said administrator, as part of the estate of John Fisher, deceased.

McALISTER, C. J., and LOCKWOOD, J., concur.