251 P.2d 897

**ARIZONA TITLE GUARANTEE & TRUST CO. v. WAGNER.**

No. 5495.

Supreme Court of Arizona.

Dec. 31, 1952.

Shimmel, Hill & Hill, and Harry J. Cavanagh, of Phoenix, for appellant.

Harold R. Scoville, of Phoenix, for appellee.

UDALL, Chief Justice.

This is an appeal from a judgment determining that plaintiff-appellee is the owner and entitled to the possession of 16 one thousand dollar Casa Grande School District bonds. The Arizona Title Guarantee & Trust Company, defendant-appellant, brings this appeal individually and as Special Administrator of the Estate of Jesse O. Wagner, deceased. The parties will be designated as they appeared in the trial court.

The plaintiff is the daughter of Mrs. Alice R. Wagner and the stepdaughter of decedent, Jesse O. Wagner. The marriage of Alice R. Wagner and Jesse O. Wagner took place in 1940. Plaintiff, whose name was changed to Wagner at decedent's request, was then seventeen years old and in the last year of high school. Mrs. Wagner, before the marriage, was employed as assistant superintendent of a private hospital in Cleveland, Ohio, which enabled her to provide comfortably for herself and plaintiff. Decedent, who was a wealthy man, wanted to provide for Mrs. Wagner and plaintiff, and therefore at the time of the marriage had Mrs. Wagner give up her employment and give notice to tenants to vacate an apartment that was a source of income to her. After the marriage the family at first made their home in the apartment in Cleveland, Ohio; later upon Mr. Wagner's retirement from active business management they moved to Phoenix and established their legal residence in Arizona. Early in the year 1950 Mrs. Wagner instituted, in the superior court of Maricopa county, a suit for divorce against her husband. Mr. Wagner took his life on April 13, 1950.

The plaintiff, after becoming a member of the family of Mr. Wagner, was always

treated by her stepfather with the same love and affection as though she were his own flesh and blood. She became very much attached to him, reciprocating his love. One cannot read this record without being impressed that decedent considered he had a paternal duty to not only support the plaintiff but to make provision for her future financial security. At no time during Mr. Wagner's lifetime did the plaintiff ever have a banking account of her own. Even when she was in the armed forces as a nurse her monthly savings were sent to decedent and the money was deposited to the Jesse O. and Alice R. Wagner checking account. In other words, she used her stepfather as a banker and relied implicitly upon him for advice and counsel in financial matters. Incidentally, decedent Wagner was painstaking in keeping a current record of all his business transactions and the pertinent entries were admitted in evidence.

The bonds that are the subject of this suit were purchased by decedent on February 7, 1950, through the brokerage house of Refsnes, Ely, Beck & Co. of Phoenix. They are bearer bonds and were found by the defendant, special administrator, in a safe-keeping box at the Westward Ho Hotel (where Mr. Wagner then resided) a few days after his tragic death. It appears to be conceded that these school district bonds were purchased with the proceeds of certain U. S. Government Bonds, series E, theretofore registered in the name of the plaintiff, Jeanne A. Wagner. These government bonds were endorsed, surrendered and cashed by plaintiff for $18,915 on February 1, 1950,—with other bonds owned by her mother—and the proceeds thereof are readily traceable into the special bank account of Mr. Wagner's upon which a check was drawn by him to pay for said district bonds.

At the outset it should be pointed out that the plaintiff does not assert ownership of the school district bonds in question on the theory of *a gift of them to her by decedent.* Rather, her right of ownership rests on the claim that such bonds were purchased by decedent as her agent from the proceeds of the U. S. Savings bonds that had been previously given to her as a gift from him.

The defendant assigns as error:

(1) the action of the trial court in admitting in evidence communications made to the witness Alice R. Wagner by decedent during the course of their marriage;

(2) the holding of the trial court that, as a matter of law, there was a valid gift by decedent J. O. Wagner, to the plaintiff; the contention being that without the testimony of Mrs. Wagner there was insufficient evidence to establish the elements of valid gift as to the savings bonds.

We shall discuss these points in the order named.

The case was tried to the court sitting without a jury. The trial court proceeded cautiously, the ruling at the beginning of

the trial being that it would hear the testimony of Mrs. Wagner subject to a motion to strike at the conclusion of the case. After all of the evidence was in the court overruled previous objections and admitted her evidence in its entirety.

The statute assertedly violated by this ruling is subsection 3 of Section 23–103, A.C.A.1939, which provides in part:

"A husband can not be examined for or against his wife without her consent, nor a wife for or against her husband without his consent; nor can either, during the marriage or afterwards, be, without the consent of the other, examined as to any communications made by one to the other during the marriage; * * *."

Certain exceptions, not applicable here, follow the above-quoted excerpt.

■ The origin of the rule that neither party to a marriage can be a witness in favor of or against the other, embodied in this subsection of the statute, is of such antiquity that it is "well-nigh undiscoverable". Commonwealth v. Allen, 191 Ky. 624, 231 S.W. 41, 42, 16 A.L.R. 484. Engrafted into the established common-law rule is the doctrine that all private and confidential communications between husband and wife are privileged and cannot be divulged by either when on the witness stand. 58 Am.Jur., Witnesses, § 375.

The statute quoted applies the prohibition to "any communications" without words of limitation or modification. The defendant strongly contends that the statute is broader than the common-law rule and applies to all communications between husband and wife without regard to their confidential or non-confidential nature.

■ While the defendant is not without authority for its position the great majority of the text writers and reported cases hold such statutes to be enactments of the common-law rule. A leading case, wherein the statute was similar to ours in that only the words "any communication" were used, is Sexton v. Sexton, 129 Iowa 487, 105 N.W. 314, 315, 2 L.R.A.,N.S., 708. The Supreme Court of Iowa stated:

"We come, then, to the question, what is meant by the expression 'any communication' as used in the statute? As we have seen, the privilege is bottomed upon considerations of public policy. Accordingly it would seem that, whatever the form of expression adopted, no more is required than that the confidences inherent in the marital relation, or incident thereto, should be fully protected. Says Mr. Wigmore, in his recent work on Evidence (section 2336): 'The essence of the privilege is to protect confidences only.' And this must be true, because there can be no reason arising out of public policy, or otherwise, requiring that every word spoken between husband and wife shall be privileged, irrespec-

tive of the presence in which spoken or the subject or occasion thereof. And, within our observation, no court has ever gone so far as to so hold. The spirit of the rule as enforced at common law, and, within our understanding, the meaning to be gathered from the statute, is that the privilege shall be construed to embrace only the knowledge which the husband or wife obtains from the other, which, but for the marriage relation and the confidence growing out of it, would not have been communicated, or which is of such nature or character as that, to repeat the same, would tend to unduly embarrass or disturb the parties in their marital relations. It is the marital communication, then, that is sought to be protected, and this is so because there is no purpose of public policy to interfere, except to guard and foster the marital relation. Any other construction would be intolerable, and would lead to most absurd results. Thus it cannot be that words spoken by husband to wife, or vice versa, in the presence and hearing of one or more third persons, and hence in the very nature of things not to be construed as in any marital sense private or confidential, must be held within the protection of the privilege, although clearly within the letter of the statute. Our attention has been called to no case going to such length. On the other hand, the books are full of cases which hold that such communications are not within the reason of the privilege. And this is true of cases arising under statutes, in the phrasing of which the privelege is made to extend to all or any communications, equally with cases arising under statutes which in terms exclude only confidential communications. These are among other cases that might be cited: Spivey v. Platon, 29 Ark. 603; Floyd v. Miller, 61 Ind. 224; Fay v. Guynon, 131 Mass. 31; Long v. Martin, 152 Mo. 668, 54 S.W. 473; Sessions v. Trevitt, 39 Ohio St. 259."

An Annotation, "Conversations between husband and wife relating to property or business as within rule excluding private communications between them" in 4 A.L.R. 2d 835, 843, states the rule under statutes purporting to exclude all communication, as follows:

"In America the rule concerning the competency of husband or wife to testify to communications between them, made while they were alone, has become statutory in nearly all jurisdictions. The statutes are mostly in general terms, and are deemed to have adopted the rule of the common law. The terms of most of them adopt the rule as broadly excluding all communications between them, but some confirm it as excluding 'confidential' com-

munications. Nearly all are construed as intending only those not made in the cognizant presence of third persons. In a few instances the prohibition is expressly confined to those that are private.

"The term 'private' is more accurate than 'confidential' to describe the general rule of evidence intended to be preserved by the statutes. For ex- ample, a communication by husband to wife through a stenographer, though confidential, is admissible, because not private. The stenographer may testify to it. Wolfe [Wolfle] v. United States (1934) 291 U.S. 7, 54 S. Ct. 279, 78 L.Ed. 617."

Mr. Wigmore, in his treatise, urges the majority rule.

"The essence of the privilege is to protect *confidences* only. This is in- evitably required by the very nature of this class of privileges (Ante, Sec. 2285). The purpose is to insure subjectively the free and unrestrained privacy of communications, divested of any apprehension of compulsory disclosure; and if the communication is not intended to be a private one, the privilege has no application to it.

"The chief question must be, for the present privilege, merely whether *confidence* or privacy is to be *presumed to have been intended,* in all marital communications, until the contrary appears, or whether the burden of showing the intention of privacy should be upon the person claiming the privilege. It would seem proper that *all* marital communications are by implication confidential, and that the contrary intention must be made to appear by the circumstances of any given instance. Looking at the habits of married persons and the infrequency of express injunctions of secrecy, this implication of confidence seems more consonant with the facts of life. Such is practically the general judicial attitude, in spite of apparent differences of phrasing: * * *." Wigmore on Evidence, 3rd Ed. Vol. VIII, Section 2336, page 640.

See also 58 Am.Jur., Witnesses, §§ 375, 380; 70 C.J., Witnesses, § 511.

We approve of the statements of law contained in the foregoing case and text quotations and hold that Dean Wigmore has laid down a correct rule relative to the meaning of the phrase "any communication" found in statutes similar to our section 23–103, supra, as well as succinctly stating the circumstances under which a husband or wife may testify without violating the privilege that protects confidences arising out of the marital relationship. The rulings of the trial court clearly indicate its knowledge of these governing principles.

 We next consider whether the plain- tiff established by competent evidence a valid gift to her by decedent of the U. S.

savings bonds from the proceeds of which the bonds in question were purchased. Section 58–102, A.C.A.1939, provides for different ways of making a valid, enforceable gift.

"No gift of any goods and chattels shall be valid unless by writing, duly acknowledged and recorded, or by will, duly proved and recorded, or unless actual possession shall have come to and remained with the donee or someone claiming under him."

No claim is made that there was either an instrument duly acknowledged and recorded or that there was a will, duly proved and recorded. The validity of the gift must be established by the last portion—declarative of the common law—which requires, as we held in the case of McNabb v. Fisher, 38 Ariz. 288, 299 P. 679:

"* * *. Essential elements of a gift are that the donor manifest a clear and unmistakable intent to give the property to the party claiming as donee, and that he pass to the latter before his death the possession and control of the thing given. Mere intention to give is not enough, nor is change of possession or control; these must concur."

█ There can be no question of the sufficiency of the intent of deceased to make the gifts as is evidenced by his own records, the testimony of plaintiff and her mother, and by the face of the bonds themselves.

Defendant tacitly admits this by its argument. However, the adequacy of the delivery is very much at issue. It seems to be well supported by authority and the cases that no absolute rule can be laid down as to what will constitute a sufficient delivery to support a gift in all cases, for in each case the character of the delivery requisite to sustain the transaction as a gift will depend very largely upon the nature of the subject-matter of the gift, and the situation and circumstances of the parties.

█ An excellent case that illustrates the problems involved in the delivery of gifts of securities of value, where, as here, such is made among members of the same family, is Shepard v. Shepard, 164 Mich. 183, 129 N.W. 201, 209. A good statement of the case is made by the court itself in summary.

"* * * We are dealing here with transactions between a father and his sons, in both of whom he had implicit confidence at the time of the transactions of 1896 and 1899 in question, and for years thereafter. The safe in which these securities were placed and kept was accessible at all times to both donor and donees. They all placed their marks upon these transactions in such a way as to indicate, in our judgment, the intention of the father to then make absolute gifts to the sons of these securities. We are unable to find an indication, for years, by any of the parties dealing with these

papers, of any other intention than that the sons were the owners of these securities. They dealt with them as their own. The father dealt with them as belonging to the sons. It is undisputed that both the complainant and the defendant had access to the securities, or alleged gifts of 1896 and 1899, at all times, and that they looked them over whenever they wished; and, in fact, carried away a considerable part of them, as is evidenced by documents in evidence. Their letters show that they treated them as theirs."

The court in holding that was a valid gift stated:

"* * * The question as to what change of possession is required to support a gift is often necessarily a relative one. The mere open and visible change of possession is obviously not possible in all cases. Thus, where the donor and donee reside together, as in the case of husband and wife, parent and child, etc., it is not required that the thing given should be removed from their common residence. It is sufficient, if it clearly appears that the donor had relinquished, and the donee had acquired, all dominion over and control of the property. Many cases are cited in support of this doctrine on page 1024 of the volume of encyclopedia above cited (14 Am. & Eng. Ency. of Law (2d Ed.) 1014), including Davis v. Zimmerman, 40 Mich. 24,

and Colby v. Portman, 115 Mich. 95, 72 N.W. 1098.

"* * * We have cited cases where the donor acted as the agent of the donees in handling the property. Although delivery is essential to perfect the gift, it is not necessary that the donee should retain the property in his possession. The subsequent possession by the donor, while it may in some cases tend to throw suspicion upon the transaction as being in fraud of creditors, is not necessarily incompatible with the donee's dominion over the property; and, if satisfactorily explained, will not divest the donee of the title to the property when once it has been acquired by him.

"* * * In the application of this rule, it is well settled that if there has been an actual or constructive delivery of the subject-matter of the gifts, with the intent to vest title, the fact that the donor retains possession of the same for any purpose is not sufficient to defeat the gift; nor is the gift defeated by the fact that the donor reserved to himself the use or income from the subject-matter of the gift."

A case similar to the instant one in that the bonds in question, which were registered in the donee's name, were kept by the donor, a doctor, in his own safety deposit box for the donee, a nurse who had been a faithful and trusted assistant for fourteen years, is Meduna v. Dayton's Estate, 121

Neb. 402, 237 N.W. 303, 304. The court, after citing authorities, held:

"* * * In the present case, where 10 * * * bonds, in the sum of $1,000 each, were registered by Dr. Dayton in the name of the plaintiff, when purchased, but such bonds were kept in the safety-deposit box of the decedent for his convenience in collecting accruing interest thereon so long as he lived, we think that a complete delivery of such bonds to the plaintiff was thereby effected. And the delivery of the bonds may be established by the declarations of the decedent that such bonds were a gift to the plaintiff."

See also Tucker v. Tucker, 138 Iowa 344, 116 N.W. 119, McNally v. McAndrews, 98 Wis. 62, 73 N.W. 315. There are two enlightening law review articles on the subject. See 21 Marquette Law Review 57; 6 Fordham Law Review 106.

█ In applying these sound legal principles to the facts of the instant case we believe no good purpose would be served by detailing all of the, evidence relative to the gift to plaintiff of these savings bonds. We merely point out that the record is clear that decedent proclaimed to his friends, neighbors and relatives, as well as to his wife and stepdaughter, the fact that he was making and settling such gifts upon her. Under these circumstances it would appear that the privilege attaching to a confidential communication between husband and wife was destroyed where such disclosures were made to third parties.

Further evidence that the donor (decedent) recognized that he had previously relinquished, and the donee (plaintiff) had acquired dominion and control of the bonds in question is found in plaintiff testifying without contradiction that on several occasions she accompanied her parents to the Valley National Bank where the bonds were kept in the family lock box and that decedent, more than once, "would hand me the bonds and ask me if I wanted to look them over and see if they were in order" before placing them back in the safe; furthermore that shortly before these bonds were cashed they were brought to their home and at that time she again had them in her physical possession. The plaintiff stated it was the decedent who advised her to surrender her government bonds—paying a low interest rate at maturity—in order that he might reinvest the proceeds for her in tax-exempt school district bonds upon which interest was paid semi-annually.

█ The proof, contrary to defendant's contention, does not entirely hinge on the testimony of the wife, Alice R. Wagner, as the record is replete with evidence of several disinterested witnesses corroborating the testimony offered by plaintiff that decedent was purchasing blocks of government bonds for plaintiff, and even more impelling is the documentary evidence, much of it in the handwriting of Jesse O. Wagner. All of this evidence leads un-

erringly to but one conclusion, i. e., that the bonds in question were validly given to the plaintiff by her stepfather.

The case was well and carefully tried by the learned trial court and we hold that it committed no error in its rulings on the admission in evidence of the testimony of Alice R. Wagner. The judgment entered was manifestly correct in that it is fully supported by the evidence and does justice between the parties. Judgment affirmed.

STANFORD, PHELPS, DE CONCINI and LA PRADE, JJ., concur.