BLANCHE E. SEXTON, Appellee, v. JAMES SEXTON, SR., Appellant.

<div style="float:right">129 487<br>f130 232<br>130 234<br>129 487<br>f139 530<br>129 487<br>f143 751</div>

**Alienation of husband's affections:** PRIVILEGED COMMUNICATIONS:
1  STATUTE. Code Section 4607 relating to privileged communications between husband and wife, is intended to protect only marital communications, and in an action for the alienation of the husband's affections the wife may testify to acts, statements and declarations of the husband, addressed to her, in proof of former affection and subsequent loss thereof.

**Same.** A defendant in an action for alienating a husband's affections cannot object to the wife's testimony as to acts and declarations of the husband, made to her during the married relation, when offered in support of his former affection and its' subsequent loss.

*Appeal from Ida District Court.*—HON. Z. A. CHURCH, Judge.

SATURDAY, DECEMBER 16, 1905*.

ACTION at law by plaintiff to recover damages from defendant, her father-in-law, for alienating the affections of her husband. There was a verdict and judgment in favor of plaintiff, and defendant appeals.— *Affirmed.*

*F. E. Gill* and *W. E. Johnston,* for appellant.

*P. W. Harding,* for appellee.

* See note bottom page 485.

BISHOP, J.— Plaintiff and James Sexton, Jr., were married in November, 1899, and for some time thereafter continued to live together. One child was born to them, at the time of the commencement of this action three years old. Before the action said James, Jr., had abandoned plaintiff and their child, and was making his home with the defendant, his father. During the trial plaintiff was called as a witness on her own behalf, and to prove that her husband regarded her with affection at and for some time after the marriage, and, further, to prove the subsequent loss or withdrawal of such affection by him, she was allowed to testify to acts, statements, and declarations on his part, addressed to her. To the same end, several letters, written to plaintiff by her husband while absent from home, and produced by her in court, were also allowed to be introduced and read to the jury. To all such evidence the defendant made timely objection, basing the same upon the statute ('Code, section 4607), which reads as follows: " Neither husband nor wife can be examined in any case as to any communication made by the one to the other while married," ·etc. · The objections were ·overruled, and upon such rulings is predicated the only contention for error as presented in argument by counsel for appellant.

This court has not been called upon before to give construction to the statute in . the precise relation exhibited by the instant record. But, as we shall see presently, cases

1. ALIENATION OF HUSBAND'S AFFECTIONS: privileged communications: statutes. have arisen presenting fact situations more or less similar, and in the determination of which the rule of the statute, and the force and effect to be given thereto, was the subject· of consideration and of pronouncement. The literal reading of the statute would seem to be quite conclusive against the right to call either the husband or wife to speak from the witness stand respecting communications had between them, no matter what the character thereof or the occasion or purpose. But we are not always restricted to the precise words em-

ployed, in getting at the meaning of a statute. And it is the real purpose and intent of the Legislature, as meant to be expressed, to which we are to give force of operation. *Noble v. State,* 1 G. Greene, 325; *Dilger v. Palmer,* 60 Iowa, 117. That which is clearly not within the intention of a statute, although within the letter thereof, is held not to be within the statute. *Crabell v. Wapello C. Co.,* 68 Iowa, 751. And a construction is not to be put upon a statute which would manifestly effectuate injustice, if it is susceptible of a different construction. *Small v. Railway,* 50 Iowa, 338.

The privilege of communications between husband and wife, was secured at common law. The rule was not designed to suppress truth, but had its origin in the fact, made clear by experience, that greater mischiefs resulted from the admission of such evidence than were likely to arise from its exclusion. In common, therefore, with other privileges analogous in character, it was grounded on public policy. In stating the reasons for the privilege Mr. Greenleaf says: "The happiness of the married state requires that there should be the most unlimited confidence between husband and wife, and this confidence the law secures by providing that it shall be kept forever inviolable; that nothing shall be extracted from the bosom of the wife which was there confided by her husband." 1 Greenleaf on Evidence, section 254. That the common-law courts were not all agreed as to the measure or extent of the privilege must be confessed, and that such lack of uniformity in decision has continued, notwithstanding the principle involved has generally found its way into the statute law of the land, is equally true. Without doubt, however, the latter fact is due in some measure to the difference in phrasing to be found in the enactments as adopted in the various States; some providing for the exclusion of so-called confidential communications only, and others, as in this State, providing in terms that any communication is within the privilege. That

the expression " any communication " is in form of words of broader import than the expression " confidential communication," is clear enough, although some courts have treated the expressions as synonymous for the purposes of practical application. Other courts, however, have placed a more strict construction upon the word " confidential," and have refused the privilege unless the communication called for either bore the impress of secrecy, or the fact appeared that it had been expressly made confidential; this, of course, in jurisdictions where the rule in form excludes only confidential communications. Any such narrow construction is avoided by use of the expression " any communication," and in the jurisdictions where adopted it is not unreasonable to suppose such was within the intention of the Legislature.

We come, then, to the question, what is meant by the expression " any communication " as used in the statute? As we have seen, the privilege is bottomed upon considerations of public policy. Accordingly it would seem that, whatever the form of expression adopted, no more is required than that the confidences inherent in the marital relation, or incident thereto, should be fully protected. Says Mr. Wigmore, in his recent work on Evidence (section 2336) : " The essence of the privilege is to protect confidences only." And this must be true, because there can be no reason arising out of public policy, or otherwise, requiring that every word spoken between husband and wife shall be privileged, irrespective of the presence in which spoken or the subject or occasion thereof. And, within our observation, no court has ever gone so far as to so hold. The spirit of the rule as enforced at common law, and, within our understanding, the meaning to be gathered from the statute, is that the privilege shall be construed to embrace only the knowledge which the husband or wife obtains from the other, which, but for the marital relation and the confidence growing out of it, would not have been communicated, or

which is of such nature or character as that, to repeat the same, would tend to unduly embarrass or disturb the parties in their marital relations.   It is the marital communication, then, that is sought to be protected, and this is so because there can be no purpose of public policy to interfere, except to guard and foster the marital relation.   Any other construction would be intolerable, and would lead to most absurd results.   Thus it cannot be that words spoken by husband to wife, or vice versa, in the presence and hearing of one or more third persons, and hence in the very nature of things not to be construed as in any marital sense private or confidential, must be held within the protection of the privilege, although clearly within the letter of the statute.   Our attention has been called to no case going to such length.   On the other hand, the books are full of cases which hold that such communications are not within the reason of the privilege.   And this is true of cases arising under statutes, in the phrasing of which the privilege is made to extend to all or any communications, equally with cases arising under statutes which in terms exclude only confidential communications.   These are among other cases that might be cited:  *Spivey v. Platon,* 29 Ark. 603; *Floyd v. Miller,* 61 Ind. 224; *Fay v. Guynon,* 131 Mass. 31; *Long v. Martin,* 152 Mo. 668 (54 S. W. Rep. 473); *Sessions v. Trevitt,* 39 Ohio St. 259.

So, too, it cannot be that the rule of privilege must be held to extend so far as to exclude all communications between husband and wife having reference to business relations existing either as between them directly, or as between them — one or both — and others.   Certainly as to business relations existing between husband and wife directly, there can be no adverse consideration of public policy. Quite to the contrary, public policy, as reflected by statute and by our decisions, permits of such relations to the fullest extent.   And it would be shocking to say that a contract thus made, or rights or liabilities thus accruing, could not be enforced because, forsooth, a communication

between the parties having relation thereto, and essential to proof, was privileged. The cases are almost unanimously against such a conclusion. The following are cases collected by Mr. Wigmore (note to section 2336): *Gordon v. Tweedy*, 71 Ala. 202; *Nolen v. Harden*, 43 Ark. 307 (51 Am. Rep. 563); *Spitz's Appeal*, 56 Conn. 184 (14 Atl. Rep. 776, 7 Am. St. Rep. 303); *Schmied v. Frank*, 86 Ind. 250; *Sedgwick v. Tucker*, 90 Ind. 271; *Hunt v. Eaton*, 55 Mich. 362 (21 N. W. Rep. 429); *Safford v. Horne*, 72 Miss. 470 (18 South. Rep. 433); *Darrier v. Darrier*, 58 Mo. 222; *Wood v. Chetwood*, 27 N. J. Eq. 311; *Gaskill v. King*, 34 N. C. 211; *Sackman v. Thomas*, 24 Wash. 660 (64 Pac. Rep. 819); *Crook v. Henry*, 25 Wis. 569. See, also, *Hanks v. Van Garder*, 59 Iowa, 179; *Giddings v. Bank*, 104 Iowa, 676. In Hanks v. Van Garder the question was as to whether testimony of a wife, to the effect that her husband had assigned a certain claim to her, and plainly involving a communication, was within the privilege of the statute, and the holding was against the privilege. In Giddings v. Bank it appeared that the defendant bank had accused plaintiff, F. H. Giddings, of being an embezzler, and had threatened him with a prosecution, unless he gave a mortgage on his homestead to secure the amount owing by him to the bank. It was claimed that Giddings, upon going home, told his wife of what had occurred, including the threats, and both Giddings and his wife were allowed to testify to the conversations had between them. Held, that there was no error.

To the general proposition thus advanced it is no answer to say that, by Code, section 4606, husband and wife are made competent witnesses for and against each other in all such cases. That statute goes no farther than to authorize the husband or wife to testify to facts within his or her knowledge, and material or relevant to the issue. It has no relation to the subject of communications made by the one to the other. " At common law neither husband nor wife

could testify in favor of or against the other. General enabling statutes have been passed in many jurisdictions, but these statutes do not affect the rule as to the so-called privileged communications between husband and wife." Elliott on Evidence, section 628, citing *Hyde v. Gannett,* 175 Mass. 177 (55 N. E. Rep. 991); *People v. Wood,* 126 N. Y. 249 (27 N. E. Rep. 362); *Mercer v. State,* 40 Fla. 216 (24 South. Rep. 154, 74 Am. St. Rep. 135). The distinction between the competency of the husband or wife, when called as witnesses, and the privilege incident to such relation, and the privilege of either against the other's disclosure of communications, is said by Mr. Wigmore to be plain enough. " And, when the legislators in the various jurisdictions took the first steps . . . by abolishing or restricting the disqualification [as witnesses], they invariably preserved by express enactment the present privilege for communications." Wigmore on Evidence, sections 2333, 2334. And again, in section 2228, the same author says: " So, too, the privilege for confidential communications is not only quite different in scope [from the qualification of husband and wife as witnesses], but stands upon its own sufficient grounds."

Moreover, and for kindred reasons, a literal interpretation of the statute would in many cases forbid an inquiry into the personal wrongs committed by one spouse against the other, and especially where such consisted of a verbal act, or where the statements or declarations accompanying a physical act were necessary to establish the true character of such act. To hold for exclusion in such cases would not only be subversive of the principle of public policy under which the rule of the statute came into existence — that is, the promotion of the interests of the marital relation — but it would be to hold for the equal effectiveness of the privilege as an engine for the suppression of the evidence of wrong, possibly crime; in many instances making it impossible, either to grant a right well-recognized in law or to administer relief, a condition wholly violative of another and well-

understood principle growing out of public policy. Accordingly there can be no reason for including within the privilege those things, the direct tendency of which is, not only to destroy the confidence of the marital relation, but to destroy the relation itself. And this thought has the support of authority. *Chamberlain v. People,* 23 N. Y. 85 (80 Am. Dec. 255); *Seitz v. Seitz,* 170 Pa. 71 (32 Atl. Rep. 578); *Smith v. Smith,* 77 Ind. 80; *Millspaugh v. Potter* (Sup.) 71 N. Y. Supp, 134. In further illustration of the proposition that the statute is not to be construed in all cases according to the literal wording, are the cases holding the wife competent to testify to dying declarations made to her by her husband. *Hilbert v. Com.* (Ky.) 51 S. W. Rep. 817; *Arnett v. Com.,* 114 Ky. 593 (71 S. W. Rep. 635).

What has been said foregoing will be sufficient to make clear the reasons for our conclusion that the statute was intended to protect only marital communications. And this conclusion is not at variance with the holding in our recent case of *Hertrich v. Hertrich,* 114 Iowa, 643, and principally relied upon by appellant. That was an action to set aside a will. The widow of the testator was called by contestants, and interrogated as to communications made to her by her husband in his lifetime. What was the character of the communications does not appear in the statement of the case, and we may assume that they were such as were induced by the marital relation. It was held that they were properly excluded. In the course of the opinion emphasis is laid upon the expression "any communication," as used in the statute, and it was said that " in the highest sense all communications of this class are privileged, because the law makes them so." It is to be remembered, however, that the attention of the court was centered upon a case for exclusion — the peculiar facts thereof brought it clearly within the reason of the statute — and the reader of the opinion may not disassociate himself from that fact in putting construction upon the language used by the court. Rightly

understood, the reference in the opinion was to marital communications. It was not intended to declare for general exclusion in all cases, having no regard for the character or the circumstances of the communication.

It may be confessed that what are marital communications cannot be answered according to any fixed rule. The varying circumstances of married life are such that the question must be made to depend for its answer upon the peculiar circumstances of the case out of which it arises. Perhaps no better guide for general observance can be found than to say that impliedly all communications between husband and wife are confidential in character, and hence privileged, and that the party asserting the contrary in any given instance must satisfy the court by the circumstances of the case that grounds for exclusion do not exist. It being made clear that the rule of privilege is not a rigid one admitting of no exceptions, we have, then, to consider whether, in view of the issue here presented, the testimony of plaintiff, in character as hereinbefore stated, may fairly be said to have been within the rule of exclusion because of marital communications. Looking first to the issue, it is clear that the burden was upon plaintiff to establish, among other things, first, that at the beginning of their married life she possessed the affection of her husband; second, that such affection had been lost to or withdrawn from her. Ordinarily the law presumes the existence of affection between the husband and wife. And there would seem to be no good reason for a different rule in cases of this character. *Bailey v. Bailey*, 94 Iowa, 598. But it was competent for plaintiff to offer evidence on the subject, and this she might do, if for no other purpose than as affecting the question of damages. Now, marital affection, or the want of it, is manifested alone by acts, either physical or verbal, and it can be fully proven in no other way than by presenting to the court or jury the relevant doings and sayings of the spouse in question. That physical acts do not come within

the rule of exclusion is the declaration of many of the cases. See those collected by Mr. Wigmore in note to section 2337. But this should be accepted 'with qualification. Knowledge may be as effectively communicated in many 'cases by physical acts as by words spoken, and, if the knowledge imparted is such in character as to come within the spirit of the rule, no good reason appears for withholding the privilege because of the means of communication adopted. Whatever may be said in respect of this, it is doubtful, to say the least, if testimony of the character in question, whether of physical or verbal acts, and limited to such, should be regarded as communications in any sense employed in the statute. The words spoken or the acts committed have no testimonial value in and of themselves. They are important only as the expression of countenance, the caress, the term of endearment, the word of hope for the marital future — or, on the other hand, the withholding of society, the blow, the curse — may serve to make evident the material fact, from the standpoint of testimonial value, of affection or the want thereof. For the purposes of present consideration they possess no outward significance, and are intended and operate only to induce belief as to a state of feeling. Regarded as such, they may be accepted as purely explanatory in character, and hence admissible under the rule of *res gestæ*.

But aside from this, and speaking first of testimony intended to establish affection, there can be nothing in the rule of privilege to justify the exclusion of testimony by a spouse bearing upon the existence of such fact; and this, whether the evidence offered be of physical acts or verbal acts. Affection between husband and wife is the rule, and, as we have seen, the law presumes it. Indeed, it is published to the world with the fact of marriage. Accordingly in no sense can it be a matter of marital confidence, and as such, subject to be violated by the one testifying to the acts, physical or verbal, commonly understood to be declaratory thereof, in proof of the fact. And in the case of verbal acts

the same reasoning applies, whether the words are spoken or written. For somewhat different reasons there can be no ground upon which to exclude testimony as to acts in proof of the loss or withdrawal of affection. The mischief which the statute was intended to avert has been done, and the principle of public policy that inspired the statute has been lost sight of.

As applied to a case such as we have before us, it has become a question simply whether there shall be vindicated another principle of public policy by so ordering that that which has been lost may be compensated for.

**2. SAME.** Surely it does not lie in the mouth of one who has entered a family circle to despoil it to plead the privilege of the statute to the sole end that he may escape the con-. sequence of his own unlawful act. It was not intended for his benefit, and every consideration of public policy that enters into it forbids him from making of it a cloak to shield him from being penalized for the mischief he has wrought.

It cannot be said that all the authorities are agreed upon the subject, but our conclusions are not only warranted by what is said in *Wright v. Wright,* 114 Iowa, 748, but find strong support in the following, among other cases that might be cited: *Henry v. Sneed,* 99 Mo. 407 (12 S. W. Rep. 663, 17 Am. St. Rep. 580) ; *Ash v. Prunier,* 105 Fed. 722 (44 C. C. A. 675) ; *Horner v. Yance,* 93 Wis. 352 (67 N. W. Rep. 720) ; *Beach v. Brown,* 20 Wash. 266 (55 Pac. Rep. 46, 43 L. R. A. 114, 72 Am. St. Rep. 98) ; *Driver v. Driver,* 153 Ind. 88 (54 N. E. Rep. 389) ; *Perry v. Lovejoy,* 49 Mich. 529 (14 N. W. Rep. 485). As disclosed by the record, the instant plaintiff made disclosure in her evidence of only such acts and conversations as tended to proof of affection and the subsequent loss thereof. It is true that, included in some of the statements and declarations of her husband, as related by her, reference was made to sayings and doings on the part of defendant, but this was carefully guarded by an instruction given to the jury.

. . There was no error in admitting the testimony complained of, and the judgment is *affirmed*.