**STATE of Iowa, Appellee,**

v.

**James B. KLINDT, Appellant.**

**No. 85–243.**

Supreme Court of Iowa.

June 18, 1986.

---

Ann Fitzgibbons of Scalise, Scism, Sandre & Uhl, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Brent R. Appel, Deputy Atty. Gen., Thomas D. McGrane, Asst. Atty. Gen., and William E. Davis, Co. Atty., for appellee.

**LARSON, Justice.**

James B. Klindt was convicted of second-degree murder in the death of his wife, Joyce. He contends (1) the court erred in allowing the State to use scientific and statistical evidence to show that a detached torso was Joyce's; (2) that a tape-recorded conversation between Klindt and his wife, was improperly admitted; and (3) the evidence was insufficient to support the verdict. We affirm.

Joyce Klindt disappeared from her Davenport, Iowa, home on March 18, 1983. On April 16, 1983, fishermen found a female torso lodged against a bank of the Mississippi River. The torso had been severed just above the navel and just below the hips. A pathologist testified that a mechanical saw, probably a chain saw, had been used to cut up the body.

### I. The Expert Testimony.

Because the torso was not identifiable by conventional means, the State was put in the unusual position of having to devote a large part of its case to proving that the alleged victim was, in fact, dead. To do that, the State relied heavily on scientific evidence.

A. *The Serologist's Testimony.* Forensic serology is an identification process involving analysis of the genetic makeup of blood and tissues. In this process, the sample to be identified is analyzed for the presence of several specific enzymes, called phenotypes or "genetic markers."

Benita Harwood, a serologist, was one of the State's witnesses. She had analyzed bone and tissue samples from the torso to identify specific genetic markers present in it. Based upon information received from

a recognized data bank, she testified that the likelihood of finding these specific markers in the population as a whole was approximately 27 out of 10,000 persons. She also analyzed blood samples from Joyce's parents, Eugene and Virginia Monahan, for the presence of these markers. She concluded the Monahans were 107.8 times more likely than a random couple to have produced an offspring with the genetic markers found in the torso.

Harwood also testified she had compared the genetic markers of the torso with those of the defendant and Bartley, the son of James and Joyce Klindt. She concluded the torso could, in fact, be that of Bartley's mother.

■ Klindt attacks Harwood's serology evidence on several grounds. Using other data in the computation, for example, he demonstrated through cross-examination that the Monahans might only be seventy times more likely than a random couple to have produced a child with the genetic markers matching those of the torso. The fact that different data could produce a probability factor of 70:1 rather than 107.8:1, we believe, does not mandate its total rejection as evidence. It could, of course, affect the weight of the evidence.

Klindt also claims that river bacteria could have affected the test results by altering the genetic markers of the torso. The State's experts, however, testified this would not be a significant problem, and it was not shown to have affected the reliability of the tests here.

The main thrust of Klindt's argument is that serology testing was not shown to be reasonably reliable or generally accepted in the scientific community. He cites the well-known case of *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), which adopted a requirement of "general acceptance" of a scientific principle as a condition precedent to receiving evidence on it.

In *State v. Hall,* 297 N.W.2d 80, 83–85 (Iowa 1980), we noted widespread criticism of the *Frye* standard, and we rejected it as a prerequisite to admission of scientific evidence "if the reliability of the evidence is otherwise established." If reliability is shown, we need not await approval by the scientific community. *Hall,* 297 N.W.2d at 85–86. *See generally* M. McCormick, *Scientific Evidence: Defining a New Approach to Admissibility,* 67 Iowa L.Rev. 879 (1982).

After *Hall* was decided, we adopted Iowa Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

■ The question, therefore, is whether the evidence would assist the trier of fact in resolving an issue. That determination necessarily involves a requirement of finding reliability, because unreliable evidence cannot assist a trier of fact. Considerable trial court discretion is allowed in making a determination of admissibility of expert testimony. *See Hall,* 297 N.W.2d at 86.

Serology is not new; testimony in this case showed that it has been regularly relied upon by pathologists. We have also approved the use of it in establishing paternity, following the lead of several other jurisdictions. *See, e.g., State ex rel. Buechler v. Vinsand,* 318 N.W.2d 208, 211–12 (Iowa 1982). *See generally* M. McCormick, *supra,* at 907–08; *Joint AMA—ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage,* 10 Fam.L.Q. 247 (1976).

In paternity cases, a serologist would presumably work with blood samples from all subjects to be tested: the known parent, the child, and the suspected father. In the present case, a blood sample was not available from the torso. In such a case, genetic identification is more complicated, according to the testimony. Blood typing and genetic identification can still be done, however, by analysis of bone and tissue samples. That was done here, and there is

no claim that this affected the reliability of the test.

■ We believe the reliability of this procedure was established and that our general rule of admissibility in paternity cases should apply here as well. The trial court did not err in admitting this evidence.

B. *The Anthropologist.* Anthropologist Clyde Snow gave his opinion of the approximate size and age of the body from which the torso had been severed. He estimated the woman's height to be four foot seven inches to five foot ten inches, her weight to be 125 to 145 pounds, and her age at twenty-seven to forty-nine. (According to other evidence, Joyce Klindt fell within these ranges.)

■ Klindt does not question Snow's qualifications as an expert in the field but appears to contend that anthropologic evidence itself, like that of serology, was not shown to be sufficiently reliable. We disagree. Forensic anthropology is a recognized scientific discipline, according to the testimony. It is used in identifying burned and dismembered crash victims and to determine the time, cause, and manner of death of decomposed victims of homicides.

The trial court did not abuse its discretion in admitting this evidence.

C. *The Statistician.* A statistician testified that the torso found in the river was more likely to be that of Joyce Klindt than any other person who had been reported missing in the area. Investigating officers developed a list of all the white females which had been reported missing in a four-state area around Davenport as of April 16, 1983, the date the torso was discovered. This list, originally showing the names of seventeen women, was narrowed by eliminating those who had obvious identifying characteristics such as scars. Four missing women remained on the list, including Joyce Klindt.

Dr. Russell Lenth testified that, as a statistical analyst, he takes data or facts which are known and attempts to determine what is likely to be true by applying the mathematical laws of probability. He testified that he was furnished with data on the torso, including race, sex, age range, and blood type. He also considered the fact that the torso had borne a child, had had an episiotomy (a surgical procedure in connection with childbirth), and that it had not been surgically sterilized. Evidence showed Joyce Klindt fell within all of these categories. From other sources, Lenth obtained information concerning some of these conditions with respect to the other three missing women and determined the frequency of certain of these conditions among the general female population. He also took into consideration the results of the "genetic markers" study by Benita Harwood, already discussed.

Based upon the likelihood of the concurrence of these factors among the missing women, Lenth testified that the probabilities were over ninety-nine percent that the torso was Joyce Klindt's rather than any of the other three.

The basis of Klindt's objection to the statistical probability testimony was basically that the underlying data was not sufficiently established. We disagree. First, the statistical analysis of genetic markers, as previously discussed in this opinion, was adequately established. Data on the frequency of certain conditions among the general population, moreover, came from the United States Department of Health and Human Services. All of this background evidence was of a type which could reasonably be relied upon by experts in the field.

Iowa Rule of Evidence 703 provides: The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the trial or hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

In attacking the statistical probability evidence, Klindt cites several cases, including *People v. Collins,* 68 Cal.2d 319, 438 P.2d

33, 66 Cal.Rptr. 497 (1968). In *Collins*, a statistician testified that there was only a one in twelve million chance that a random couple on the street possessed the unusual characteristics of the defendants who were identified at trial. The purpose was to show that these defendants, and no others, had committed the crime. The court in *Collins* reversed the conviction, partly on the basis that the testimony lacked an adequate foundation.

That case, and others cited by Klindt, are distinguishable because in those cases an attempt was made to rule out all other possibilities in identifying the perpetrators of the crime. Here, the extent of the testimony was very limited. It did not purport to identify the perpetrator of a crime, as in *Collins*. It did not even purport to show the torso was actually Joyce Klindt's. It only showed that the chances were much stronger that the torso was Joyce's than of any of the other three missing women.

■ In any event, other cases addressing the issues of admissibility of scientific evidence, under other facts, are of limited value as precedents. Each case turns to a large extent on its own facts and the discretion of the trial court. *See Hall*, 297 N.W.2d at 85–86. The trend of our cases and evidence rules, moreover, has been toward broadening the scope of admissibility of expert testimony. We believe the court did not abuse its discretion in admitting the statistical evidence in this case.

## II. *The Tape Recording.*

At trial, the State introduced a recording of a conversation in the Klindt home between the defendant and Joyce made the day before the disappearance. Joyce had taped the conversation without Klindt's knowledge, and had left it with a friend for safekeeping. The tape evidenced a bitter dissolution dispute and included a reference to a prior threat made to Joyce by Klindt. It included the following exchange:

JOYCE: Over there and stuffing me . . .

JAMES: Why was I lying to ya?

JOYCE: . . . and trying to kill me . . . stuffing my head down the bed and . . .

JAMES: I was trying to kill you . . . ya . . .

JOYCE: . . . pulled my head down.

JAMES: I was trying to show you how much I don't want you to get a lawyer.

JOYCE: Oh you hurt me. You had my head down in the covers and told me you were (gonna) cut me up in little pieces and I was gonna die.

Klindt asserts two errors in connection with the admission of the tape: There was not a proper foundation for it, and it violated the statutory privilege accorded to interspousal communications by Iowa Code section 622.9.

In connection with the foundation requirements, Klindt relies on *United States v. McMillan*, 508 F.2d 101 (8th Cir.1974) (seven criteria for admission of tape recordings). In *State v. Russell*, 261 N.W.2d 490 (Iowa 1978), we recognized *McMillan*'s criteria but applied a more abbreviated test: Whether "evidence clearly establish[es] that it is accurate and trustworthy." *Id.* at 495. We apply the *Russell* test here.

■ There was testimony that Joyce had been instructed in the use of the recorder and that she knew how to operate it. There was evidence that Joyce and her neighbor had successfully tested the recorder before the conversation was taped, that Joyce played back the recorded conversation in the presence of at least one witness, and that the recording which was later presented in court was the same recording. We believe the tests of accuracy and trustworthiness were satisfied.

Klindt also objects to the introduction of the tape recording on the ground it violated our marital communication privilege statute, which provides:

Neither husband nor wife can be examined in any case as to any communication made by the one to the other while married, nor shall they, after the marriage relation ceases, be permitted to reveal in

testimony any such communication made while the marriage subsisted.

Iowa Code § 622.9 (1983).

The State argues that the marital privilege does not apply in a trial for a crime committed by one spouse against the other. In addressing this question, we must draw a distinction between the statutory disqualification of a spouse as a *witness* against the other (Iowa Code § 622.7 (1983)), and the marital privilege (Iowa Code § 622.9 (1983)). The disqualification statute, section 622.7, expressly provided it would not apply to "a criminal prosecution for a crime committed one against the other...." In contrast, the marital privilege statute, section 622.9, is very broad, prohibiting disclosure of *any* communication without any express exceptions. It is the privilege statute, not the disqualification statute, which is implicated in this case. (The disqualification statute, § 622.7, has now been repealed. *See* 1983 Iowa Acts ch. 37, § 7.)

The State argues that, despite the fact that section 622.9 provides no express exceptions, the marital privilege is inapplicable in a prosecution for a crime committed against a spouse.

There have apparently been no Iowa cases applying such an exception, although we have noted that the privilege is made inapplicable in certain prosecutions by *statute*. *See, e.g., State v. Johnson,* 318 N.W.2d 417, 439 (Iowa 1982) (marital privilege statute inapplicable in child abuse cases pursuant to statute. *See* Iowa Code § 232.74).

While the State cites two Iowa cases in support of its contention that a criminal-prosecution exception should be imposed, neither is directly on point. One, *State v. Shultz,* 177 Iowa 321, 158 N.W. 539 (1916), involved the disqualification statute, not the privilege statute. That case must therefore be distinguished. The other Iowa case cited, *Sexton v. Sexton,* 129 Iowa 487, 105 N.W. 314 (1905), applied an exception to the marital privilege statute— but in an alienation of affections suit, not a criminal prosecution. In *Sexton,* a wife was allowed to testify to communications made to her by her husband in order to establish that at one time he had affection for her.

While the *Sexton* case did not establish an exception for criminal prosecutions, it is authority for the proposition that, despite the broad language of the marital privilege statute, exceptions should be recognized. This court noted that

a literal interpretation of the [privilege] statute would in many cases forbid an inquiry into the personal wrongs committed by one spouse against the other, and especially where such consisted of a verbal act, or where the statements or declarations accompanying a physical act were necessary to establish the true character of such act. To hold for exclusion in such cases would not only be subversive of the principle of public policy under which the rule of the statute came into existence—that is, the promotion of the interests of the marital relation—but it would be to hold for the equal effectiveness of the privilege as an engine for the suppression of the evidence of wrong, possibly crime.... Accordingly there can be no reason for including within the privilege those things, the direct tendency of which is, not only to destroy the confidence of the marital relation, but to destroy the relation itself.

*Id.* at 493–94, 105 N.W. at 316–17.

While there appear to be no Iowa cases on point, cases from other jurisdictions have applied an exception for prosecutions of crimes committed against a spouse. *See, e.g., People v. McCormack,* 278 A.D. 191, 196–97, 104 N.Y.S.2d 139, 145 (1951); *State v. Moxley,* 6 Wash.App. 153, 158, 491 P.2d 1326, 1329 (1971).

Evidence writers also recognize that common-law exceptions are permissible, even desirable, for public policy reasons. Wigmore, for example, says

if the promotion of marital peace, and the apprehension of marital dissension, are the ultimate ground of the privilege, it is an overgenerous assumption that the wife who has been beaten, poisoned or

deserted is still on such terms of delicate good feeling with her spouse that her testimony must not be enforced lest the iridescent halo of peace be dispelled by the breath of disparaging testimony. And if there were, conceivably, any such peace, would it be a peace such as the law could desire to protect?

8 *Wigmore on Evidence* § 2239, at 243 (McNaughton Rev.1961). *See also McCormick's Handbook of the Law of Evidence* § 84, at 170–71 (2d ed. E. Cleary 1972).

 We hold that, in a case involving the prosecution for a crime committed against a spouse, the communication privilege of section 622.9 is inapplicable. We conclude that the court did not err in admitting the recording.

### III.  *Sufficiency of the Evidence.*

Klindt argues that the evidence was insufficient to support a charge of second-degree murder. Specifically, he claims that it was insufficient on the element of malice aforethought. *See* Iowa Code §§ 707.1–.3 (1983). Malice aforethought is defined as "that condition of mind which prompts one to do a wrongful act intentionally, without legal justification or excuse." *State v. Love,* 302 N.W.2d 115, 119 (Iowa 1981) (quoting *State v. McCollom,* 260 Iowa 977, 988, 151 N.W.2d 519, 525 (1967)). Malice need not exist for any specific period of time; it is sufficient if it existed for any time before the killing. *Love,* 302 N.W.2d at 119. The use of a deadly weapon, accompanied by an opportunity for deliberation, is evidence of malice. *Id.*

When reviewing a case for sufficiency of the evidence, we construe the record in the light most favorable to the State. *State v. Moses,* 320 N.W.2d 581, 586 (Iowa 1982).

We have already concluded that the scientific and statistical evidence was properly admitted. There was other substantial evidence to support the verdict. The parties were locked in a bitter dissolution dispute. There was also evidence that, after Joyce's disappearance, Klindt had given conflicting statements to investigating officers.

Klindt had an ongoing extramarital relationship prior to and following Joyce's disappearance, and the disappearance by Joyce was out of character for her.

In addition, a witness testified she had seen Klindt "putting plastic bags" in his boat, then transporting them out into the river. One of the bags was said to be so heavy that it required him to use both hands to carry it.

 There was other evidence supporting the verdict, but it is not necessary to detail it here. We merely conclude that the evidence was sufficient.

We have considered all of the arguments raised on appeal and conclude that there is no basis for reversal.

AFFIRMED.