**In re the Matter of Kay Marie SYBERS, William A. Sybers, Appellant.**

No. 97–1032.

Supreme Court of Iowa.

July 29, 1998

As Revised on Denial of Rehearing Oct. 5, 1998.

Jerry Crawford and J.D. Hartung of the Crawford Law Firm, Des Moines, and Harry L. Harper, Panama City, Florida, for appellant.

Thomas J. Miller, Attorney General, Ann E. Brenden and Harold A. Young, Assistant Attorneys General, and Harry Shorstein, Florida State Attorney, for appellees State of Iowa and State of Florida.

Considered by McGIVERIN, C.J., and HARRIS, LAVORATO, NEUMAN, and TERNUS, JJ.

NEUMAN, Justice.

This appeal concerns a petition for disinterment brought by the State of Florida to search for evidence supporting its theory that Dr. William Sybers murdered his wife, Kay Sybers, by injecting potassium into her veins. Adamantly opposing disinterment is Kay's family, insistent that their loved one—having already been once autopsied—should now be permitted to rest in peace. The district court, in a carefully written opinion, observed that the case was "exceedingly close." It nevertheless granted Florida's petition over the family's resistance.

On our de novo review, we firmly believe the slender thread upon which Florida rests its case is insufficient to overcome the fami-ly's equitable plea. We, therefore, reverse the judgment of the district court.

## I. Background Facts and Proceedings.

Kay Sybers—formerly of Fort Dodge, Iowa—died on May 30, 1991, at age fifty-two, in Panama City, Florida. Her body is buried alongside family members in a Fort Dodge cemetery. Her husband, William Sybers, was a pathologist and Florida medical examiner. By all accounts they were a devoted couple. Suspicions surrounding Kay's death, however, led Florida authorities in 1997 to indict William Sybers for her murder. This followed a petition filed April 26, 1994, by the Webster County Attorney on behalf of the State of Florida, seeking to disinter Kay's body in accordance with Iowa Code section 144.34 (1993).

Because Kay's immediate family—as well as William Sybers—unanimously opposed exhumation, the matter came on for trial before the Iowa district court. Petitions for disinterment are tried in equity. *Life Investors Ins. Co. of Am. v. Heline*, 285 N.W.2d 31, 36 (Iowa 1979). On our de novo review, *see id.*, we find the following facts established by the record.

At dawn on the day of Kay's death, William left the family townhouse for the pathology clinic where he worked. Two of the Sybers' children were at home on summer break from college. During a 7 a.m. meeting with colleagues, William expressed concern over his wife's fitful night's sleep, her complaint of chest and left arm pains, her chronic reluctance to seek medical attention, and his inability to obtain a blood sample for testing despite two attempts at inserting a needle in her arm.[1]

Sybers asked Dan Harris, a staff paramedic and family acquaintance, to drop by the townhouse to check on Kay, get a blood sample, and perhaps convince her to go to a hospital for examination. Harris asked William Johnson, another clinic employee, to accompany him. They arrived at the Sybers' home at about 10 a.m., and found Kay in her

---

1. Another pathologist explained that doctors are "absolutely the worst at ... drawing blood" be-cause other staff routinely perform the task.

bed, unresponsive. With some difficulty, Harris and Johnson moved her to the floor to perform CPR. Their efforts proved futile. Meanwhile, the Sybers children had summoned emergency medical services. They, too, were unsuccessful in reviving her. Police soon arrived. Harris, the most experienced paramedic on the scene, estimated that Kay had been dead from thirty minutes to an hour before they arrived; later estimations by others ranged from thirty minutes to three hours.

It is the practice in Florida, following an unattended death, for the body to be transported to the closest medical examiner for autopsy. In this case, of course, that would have been William's duty. When William arrived on the scene, however, he was visibly distraught. Thus no one questioned his decision to have the body transported directly to a funeral home recommended by Johnson. Kay—a medical technologist by training—had on many occasions expressed her desire not to be autopsied. William believed he was carrying out her wishes.

On further reflection later in the day, William's colleagues counseled that an autopsy was required under the circumstances. William readily agreed, dismissing his earlier decision as influenced by grief. By that time, however, the body had already been embalmed in preparation for transport to Iowa for burial.

Arrangements were made for Dr. Gary Cumberland—a forensic pathologist from another part of Florida who had no personal association with William Sybers—to perform the autopsy on June 1, 1991. Meanwhile, the Florida Department of Law Enforcement (FDLE) received an anonymous phone call reporting that William Sybers had murdered his wife. Dr. Cumberland was notified that the FDLE had developed an interest in Kay's death. Three of its investigators attended the autopsy.

Giving due regard to the law enforcement investigation and the fact the deceased was the spouse of a fellow medical examiner, Dr. Cumberland undertook the autopsy with special care and thoroughness. Substantial toxicological evidence—blood, fluid, hair, fingernail, and tissue samples—was taken from the body and surrendered to the FDLE. In Dr. Cumberland's words, the autopsy investigation "fail[ed] to reveal a convincing anatomic cause for death." His report to the FDLE also indicated that "no toxicological substances of note were recovered" from materials submitted to the Dade County Medical Examiners Office. Dr. Cumberland ruled the cause of death as "sudden unexpected death due to undetermined natural causes." Under pressure from Florida authorities still investigating a charge of murder, Dr. Cumberland later amended his report to omit the word "natural" from his conclusion.

Factors keeping the pending murder investigation alive included the anonymous phone call, allegations of an extramarital affair and gambling debts, numerous bruises on Kay's body, needle marks, and no documented medical history of disease that would account for her unexpected death at age fifty-two. No facts supported the allegations of personal wrongdoing, however, and the physical evidence could all be countered by plausible explanations. Paramedics on the scene accounted for the bruising—inflicted during CPR and while sliding the body, wrapped in a sheet, down the townhouse's narrow staircase. William Sybers explained the origin of the two needle marks. It was well known that Kay Sybers was severely overweight and suspected borderline diabetes but resisted medical diagnosis and treatment because of her obesity and personal acquaintance with all the local physicians. She had recently complained of chest pains and extreme tiredness to friends and domestic help. One close friend, a nurse, reported that Kay was so troubled by chest pains that she carried a cellular phone to a bridge game so she could contact William in an emergency. Finally, Kay's family provided a history of heart disease, diabetes and premature, unexplained deaths on her paternal side.

The State of Florida's murder investigation of William Sybers nevertheless gained certain notoriety in the local press. After two state attorneys who reviewed the case determined the evidence warranted no criminal prosecution, the governor of Florida appointed a third prosecutor in 1993, giving the case a "high priority." Medical and legal

experts probing the death theorized that Kay may have been killed by a "perfect poison" such as potassium. Potassium, an element indigenous to the human system, can cause immediate death when administered in a lethal dose. Yet it is virtually undetectable after death. This meant none of the Florida experts, in Dr. Cumberland's words, could perform a "meaningful postmortem potassium evaluation."

The case was eventually referred to Dr. Fredric Rieders, a forensic toxicologist whose laboratory in Pennsylvania is known for pioneering new methods of detecting and measuring toxic substances. As the district court noted, however, Dr. Rieders "labored under the [mistaken] belief that Dr. Hearn of the Dade County Medical Examiner's Office had earlier found evidence of possible potassium poisoning." The potassium-poison theory had, in fact, merely come out of the investigatory discussions; it had no scientific basis when proposed.

Florida authorities sent Dr. Rieders fluid extracted from the lower chamber of Kay's heart. The fluid to be analyzed contained a mixture of blood and embalming fluid. To determine the percentage of blood in the sample, Dr. Rieders began by testing for iron—theorizing that blood contains iron and embalming fluid does not. The record reveals that normal iron levels would have been 450–520 mg/L, with 485 being the midpoint. The iron level of the fluid tested was 171 mg/L, indicating that the specimen was one-third blood and two-thirds embalming fluid. With this 1:3 ratio in mind, potassium in the specimen was measured, with results of 38 mmol/L. Dr. Rieders tripled this figure to account for the dilution factor of the embalming fluid, resulting in a calculation showing the potassium level in Kay Sybers' blood was 114 mmol/L. The expectable range of potassium in a normal individual's blood is 42–52 mmol/L. From these calculations Dr. Rieders concluded that a lethal dose of potassium had been administered to Kay Sybers, causing her death. His report hastened to add, however, that "[t]he final issuance of saying this is the cause of death is up to a pathologist."

Pathologists testifying on behalf of the State of Florida relied on Dr. Rieders' consultive report to support their opinion that Kay Sybers' body must be exhumed for further forensic testing. Dr. Joan Wood, medical examiner for Florida's Sixth Judicial Circuit, called Rieders' testing approach "novel but very logical." Accordingly, she believed that several areas of the body should be tested for potassium level differentials. For example, because death from potassium poisoning occurs rapidly, if a person were injected with potassium in the arm, the potassium concentration in that area should be very high compared to the potassium concentration in the right leg. In addition to searching for causes of death related to potassium poisoning, the reautopsy proposed by Dr. Wood would include further testing of the bruises on Kay's body, study of the bone marrow, dissection of the posterior neck, and dissection of blood vessels.

Highly qualified experts called by the resisters sharply criticized Dr. Rieders' conclusions and the State of Florida's reliance on them. Among the experts finding fundamental flaws in Dr. Rieders' conclusions were Dr. John Coe, professor of pathology at the University of Minnesota School of Medicine and former Hennepin County medical examiner who, according to the district court, is "a universally acknowledged expert on the body's chemistry following death"; Dr. Robert Schelper, director of autopsy services at the University of Iowa; Dr. Calvin Grant, recently retired director of the toxicology laboratory at Hennepin County Medical Center in Minneapolis; and Dr. Earl Rose, recently retired professor of pathology at the University of Iowa College of Medicine. These experts essentially concurred in the belief that postmortem "diffusion" of potassium in the body precludes drawing accurate conclusions from potassium measurements in the blood or tissue of a deceased person. This is so, they explained, because upon death blood cells naturally rupture, releasing potassium into the bloodstream. Potassium also diffuses from muscle and tissue into the vasculature. These factors not only call into question the testing of fluids drawn shortly after death; diffusion occurring over the course of six years would have equalized

the potassium levels in various parts of the body. Moreover these experts challenged Dr. Rieders' assumption that the specimen tested was one-third blood, and the assumption that Kay Sybers had normal iron levels, *i.e.,* suffered no anemia. These concerns were corroborated by Dr. Bernard Adams, another Florida medical examiner, who believed no meaningful conclusions could be drawn without comparing the potassium levels in other embalmed bodies. As the district court observed, because Dr. Adams' view was not embraced by those involved in the Florida investigation, he had played no role in the effort since 1993.

The record also reveals that Kay Sybers' family—including her now-deceased mother—have vehemently opposed disinterment. They firmly believe Kay died of natural causes and, because she has already once been subjected to autopsy, should now be permitted to rest in peace. In the words of Kay's thirty-three-year-old son, Bill, speaking for "everyone in my family and all my mother's friends as well,"

we oppose the proposed exhumation of her body with every possible ounce of strength we have, that we are offended by the very notion and infuriated and frustrated.

I, speaking for myself, believe that my mother's body has been violated against her wishes, and I believe that her memory has been violated as well; and it's our greatest wish as a family—and this is my father's wish most of all—that my mother be allowed to rest in peace and that my family finally be allowed to live in peace.

He testified that Kay's mother—his grandmother—"opposed [the idea of exhumation] with every fiber of her being." This view was echoed by Kay's brother, Bruce Cornell—a Fort Dodge attorney—who elaborated at length on his sister's lifelong neglect of her health. He also acknowledged that while he was initially open to the idea of a second autopsy, he changed his mind when he learned Florida prosecuting authorities misled him regarding the thoroughness of the first autopsy.

Based on this record, the district court concluded that the "probative value of the autopsy evidence and the need for it weigh more heavily in the balance than the deeply-held and sincere feelings of Mrs. Sybers' family." While expressing regret for whatever distress the family might suffer from disinterment, the court believed further autopsy would produce evidence "confirming or negativing" proof of criminal responsibility, and "bolstering or undermining" Florida's claim that Kay died from injection of a lethal substance.

William filed a posttrial motion under Iowa Rule of Civil Procedure 179(b) to request enlargement of the court's disinterment order "to provide more directive involving the disinterment and autopsy." Specifically, William requested that family representatives be allowed to participate equally in the reautopsy; that the particulars of the exhumation and reautopsy be more fully described; that the family be provided equal samples for testing; and that the court provide procedural guidelines, including measures to ensure due reverence to the body. The court denied the motion, finding nothing in the language of section 144.34 to authorize court involvement in the process beyond ordering exhumation. This appeal by William Sybers followed.

## II. Issues on Appeal.

William urges two grounds for reversal. First, he claims the district court improperly applied the "reasonable cause" standard for disinterment prescribed by Iowa Code section 144.34 and prior decisions of this court. Second, he challenges the novel evidence relied on by the petitioner's expert witnesses, arguing it should have been excluded under Iowa Rules of Evidence 702 and 703. In the alternative, he challenges the court's denial of his rule 179(b) request for enlargement of particulars related to the autopsy. We need not address the rule 179(b) argument because we resolve the first question in appellant's favor.

## III. Analysis.

Iowa Code section 144.34 governs petitions for disinterment. The statute states, in pertinent part:

Disinterment for the purpose of autopsy or reburial by court order shall be allowed only when reasonable cause is shown that someone is criminally or civilly responsible for such death, after hearing, upon reasonable notice prescribed by the court to the surviving spouse or in the spouse's absence, death, or incapacity, the next of kin. Due consideration shall be given to the public health, the dead, and the feelings of relatives.

Iowa Code § 144.34. In three prior cases this court has discussed the statute's "reasonable cause" standard in the civil context, resolving each controversy in favor of disinterment. See Heline, 285 N.W.2d at 32 (disinterment ordered at request of insurer to determine if insured's death was accidental); In re Proposed Disinterment of Jarvis, 244 Iowa 1025, 1027, 58 N.W.2d 24, 25 (1953) (insurer requested disinterment to determine if death accidental); In re Disinterment of Tow, 243 Iowa 695, 697, 53 N.W.2d 283, 284 (1952) (workers' compensation carrier requested disinterment of deceased worker to determine if death resulted from employment-related injury).[2]

Tow involved a widow's claim that her husband died from tetanus contracted from a work injury. Tow, 243 Iowa at 697, 53 N.W.2d at 284. Because no autopsy had been performed, the cause of death was at issue. Competent evidence in the record convinced the district court that an autopsy would prove or disprove whether the decedent's death was causally connected to his employment, a determination that would settle the insurer's claim that death resulted from a nonwork-related cause. Id. at 700, 53 N.W.2d at 286. On appeal we affirmed the disinterment order.

Similarly, in Jarvis, no autopsy had been performed on the deceased, a seventy-seven-year-old man injured in an auto accident eight days before his death. He had suffered significant injuries to his right leg,

arm, shoulder, and chest. Jarvis, 244 Iowa at 1026, 58 N.W.2d at 24–25. The death certificate listed cerebral hemorrhage as "directly leading" to Jarvis' death. Id. at 1027, 58 N.W.2d at 25. We affirmed the district court's finding of reasonable likelihood that an autopsy would determine the precise cause of death, settling the controversy. Id. at 1028, 58 N.W.2d at 26.

In Heline, our most recent decision interpreting section 144.34, the deceased's death certificate listed death by "natural causes—cardiac arrhythmia," prompting the insurer to deny double indemnity benefits payable upon accidental death. Again, no autopsy had been performed. Heline, 285 N.W.2d at 32. Both parties' experts agreed that autopsy would "likely" yield information on cause of death. The district court nonetheless refused to order disinterment because of the four-year delay between the death and the request for disinterment. Id. at 33. We reversed. In doing so we first concluded section 144.34 places no time restriction on disinterment requests; passage of time merely bears on the probative value of the autopsy. Id. Turning to the second prong of the statute, we announced a balancing test:

[I]f matters of public health, the dead, and feelings of relatives are established as countervailing considerations in a particular case, disinterment may still be allowed if the probative value of the autopsy evidence, and the need for it, weigh more heavily in the balance.

Id. at 34. The record in Heline contained no persuasive proof that disinterment would offend the dead or the feelings of relatives. Id. at 34. Given the likelihood that autopsy would resolve the cause of death issue, we reversed and remanded to the district court for an order permitting disinterment. Id. at 36.

With these cases as a backdrop, we consider the controversy before us. We are con-

---

**2.** The 1950 statute interpreted in Tow and Jarvis, Iowa Code § 141.25 (1950), had slightly different language:

No application for a permit to disinter for the purpose of holding an autopsy shall be granted by the court or state department except under circumstances such as to cause the belief that someone is criminally or civilly liable for such death. A proper showing shall be made in every case and due consideration shall be given to the public health, the dead, and the feelings of relatives and friends. The limitations of this section shall not apply when the application is made by the surviving spouse or next of kin.

fronted with far more compelling claims than those previously considered, both with respect to the complex forensic theories underlying the petition for disinterment, and the family's expressed opposition to it. Additionally, the stakes are raised by the fact that Florida's request for disinterment proceeds from a criminal, rather than civil, inquiry into the cause of death.

**A.** We turn first to appellant's claim that Dr. Rieders' potassium poisoning hypothesis is unreliable and, thus, his testimony should not have been admitted by the court under Iowa Rules of Evidence 702 and 703.[3] The question is a close one. By any measure, Dr. Rieders would be qualified by "knowledge, skill, experience, training [and] education" to offer his opinion on a question of forensic toxicology. *See* Iowa R. Evid. 702. The record makes equally clear that his postmortem potassium measurement theory is not only novel but otherwise untested (and, inferentially, unaccepted) within the scientific or medical community.[4] *See* Iowa R. Evid. 703.

 This court is committed to a liberal approach to the admissibility of expert testimony. *Williams v. Hedican,* 561 N.W.2d 817, 822–23 (Iowa 1997). Yet we are likewise committed to the principle that only *reliable* evidence can—in the words of rule 702— "assist the trier of fact." *Id.* at 823; *State v. Klindt,* 389 N.W.2d 670, 672 (Iowa 1986). The evidentiary foundation needed to establish reliability "depend[s] on the complexity of the evidence and the likely impact of the evidence on the fact-finding process." *Williams,* 561 N.W.2d at 823 (citing *State v. Hall,* 297 N.W.2d 80, 85 (Iowa 1980)).

 Here, the district court accepted Dr. Rieders' report and deposition while "readily acknowledg[ing] the controversy surrounding that testimony." The court, sitting as the trier of fact without a jury, found the evidence useful to understanding the issues before it. *See* Iowa R. Evid. 702. The case's procedural posture precluded any danger of confusing or misleading a jury. *See* Iowa R. Evid. 403. Moreover, by allowing the evidence, the court preserved the record for our de novo review. *See In re Estate of Evjen,* 448 N.W.2d 23, 24 (Iowa 1989); *In re Marriage of Anderson,* 509 N.W.2d 138, 142 (Iowa App.1993). Thus, we cannot say, as a matter of law, that the court abused its discretion in admitting Dr. Rieders' opinion testimony.

**B.** The novel and untested nature of Dr. Rieders' theory, however, seriously affects the weight to which it is entitled as we consider the probative value of disinterment and reautopsy. Pathologists Coe, Brandt, Schelper and Rose each testified at trial that Dr. Rieders' theory had *no* validation in the scientific community. Dr. Adams, a chief medical examiner from Florida, believed Rieders' theory could be relied upon only if postmortem potassium differentials could be demonstrated in other embalmed bodies. The opinion of the only two experts advocating Rieders' theory—Dr. Joan Wood of Florida and Dr. Thomas Bennett, former Iowa state medical examiner—were substantially discredited at trial. Dr. Wood, having already conceded that Dr. Rieders' theory had never been replicated or peer reviewed, demonstrated her unfamiliarity with potassium concentration comparisons emphasized by Dr. Coe, admitting further knowledge would affect her opinion about Dr. Rieders' calculations. Dr. Bennett, who in a pretrial deposition denied that the facts sought by Rieders and Wood could be established in a second autopsy, changed his mind at trial,

---

**3.** Iowa Rule of Evidence 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Iowa Rule of Evidence 703 states:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the trial or hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

**4.** Dr. Joan Wood, the theory's principal proponent at trial, conceded in her testimony that "[s]o far as I know, no one, prior to this case, has written anything other than that postmortem blood potassium is not a reliable indicator of premortem potassium levels."

claiming to have only recently read Dr. Rieders' testimony for the first time. On cross-examination, however, he remembered having reviewed all the materials from Dr. Rieders when formulating his initial, contrary, opinion.

■ That brings us to the crux of the case. In the civil context, our prior cases have suggested that exhumation should be allowed if "there is reasonable likelihood that an autopsy would *either confirm or negative* the claim of the [applicant]." *Tow,* 243 Iowa at 700, 53 N.W.2d at 286 (emphasis added); *accord Heline,* 285 N.W.2d at 33; *Jarvis,* 244 Iowa at 1028, 58 N.W.2d at 25. Yet faithful adherence to the language of section 144.34 requires a reasonable cause showing "that someone *is* criminally or civilly responsible for such death." (Emphasis added.) In the criminal context, we believe this semantic distinction takes on crucial importance. Whether the proponent of disinterment is the state, as here, seeking to inculpate a defendant in the death, or the defendant (in another case) seeking to exculpate himself or herself, the extreme remedy of disinterment must in equity require more than speculation that the outcome *will or will not* support the desired end. The district court applied just such an equivocal "standard" here—that reautopsy may yield proof "inculpating or exculpating" William Sybers, "bolstering or undermining" the State's claim, or "supporting or undermining" the criminal charge. With all due respect, we must reject this "either/or" standard.

■ When considering the language of section 144.34 in the criminal context, we believe the statute requires the proponent of disinterment to show by the greater weight of the evidence that disinterment will yield proof of criminal culpability.[5] This is consistent with the general rule that an order for disinterment "should not be made except on a strong showing that the facts sought will be established by an exhumation or autopsy." *Heline,* 285 N.W.2d at 34 (quoting 25A C.J.S. *Dead Bodies* § 4(3), at 506 (1966)).

Our view is fortified by the State of Florida's assertion that it will proceed upon its criminal indictment irrespective of the outcome of this proceeding. Clearly its motivation in seeking disinterment is not to find proof exculpating William Sybers. If the reautopsy results were to prove inconclusive—as we believe a preponderance of the evidence predicts they would—the State would merely proceed based on the circumstantial evidence at hand.

By contrast, no uncertainty surrounds the proof of Kay Sybers' express aversion to autopsy and her family's vehement opposition to it now that she is deceased. Good reasons exist for their considerable resistance. Dr. Wood has proposed an aggressive reautopsy, including the deep harvest of samples for differential testing, search for injection sites by skin incisions, dissection of the blood vessels from all four extremities, removal of the spinal cord, and sectioning of the bone marrow. Samples would also be taken of the soil surrounding the vault, pieces of Kay's clothing and of the casket lining, and the water used for sprinkling the cemetery. Such disruption of the body and burial site is in striking contrast, for example, to the limited postmortem examination proposed in *Jarvis*—exhuming the body to shave slivers of brain tissue for microscopic examination. *Jarvis,* 244 Iowa at 1032, 58 N.W.2d at 28.

The record reveals that Kay's family has more than a "mere reluctance," *Heline,* 285 N.W.2d at 34, or "dislike," *Jarvis,* 244 Iowa at 1031, 58 N.W.2d at 27, of autopsy. Their collective decision followed a lengthy conversation with the Florida prosecutor, examination of relevant deposition testimony concerning the first autopsy, and a week of family discussion before deciding whether to support the Florida investigation. Attorney Bruce Cornell's letter to Dr. Cumberland related that "[m]y mother . . . spent three days in Intensive Care in January 1993, for stress related directly to these family problems." Cornell, voicing sentiments shared by the family, was "[a]bsolutely, unequivocally, beyond any doubt . . . opposed to disinterment."

---

5. Conversely, before a defendant could prevail on an exhumation request, he or she would have to prove it more likely than not that disinterment would yield *exculpatory* evidence.

■ On balance we are convinced that respect for the memory of Kay Sybers and the sincere feelings of her closest relatives substantially outweigh the State of Florida's dubious proof that disinterment and a *second* autopsy will furnish probative evidence that William Sybers is criminally responsible for her death. Accordingly, we reverse the judgment of the district court.

**REVERSED.**

All justices concur except McGIVERIN, C.J., who dissents without opinion, and TERNUS, J., who concurs in the result only.